Ronald W. McBETH, Richland County
Assistant States Attorney, Petitioner
and Appellee,

v.

M.D.K., a child, Respondent,

and

L.K.K., mother of said child,
Respondent and Appellant.

In the Matter of the INTEREST OF
M.D.K., a minor child.

Civ. No. 890183.

Supreme Court of North Dakota.

Oct. 24, 1989.

Colin A. Bailey (argued), Wahpeton, for respondent and appellant.

Earle R. Myers, Jr. (argued), State's Atty., Wahpeton, for petitioner and appellee.

ERICKSTAD, Chief Justice.

L.K.K. (hereinafter Lisa, a pseudonym), mother of M.D.K. (hereinafter Mary, a pseudonym), appeals from a juvenile court judgment terminating her parental rights. We affirm.

Lisa was 23 years old and unmarried at Mary's birth on January 18, 1987. Paternity has never been established for Mary. Lisa had previously been married for five years and had two children of that marriage. Her former husband has custody of those children.

Records indicate that Lisa and Mary have been involved with child protection services several times in other jurisdictions. On February 12, 1987, at approximately 3:00 a.m., Pierre, South Dakota, city police and a social worker were called to investigate a domestic complaint arising out of difficulties between Lisa and her live-in boyfriend, Darcy Christianson. Mary was placed in foster care. It was then discovered that Mary had been hospitalized in Pierre, South Dakota, with a skull fracture on January 24, 1987, six days after her birth. According to Lisa, the head injury occurred after Lisa had been out drinking. When she returned she breast-fed Mary and fell asleep. Mary then fell off the bed and hit her head on the floor. Lisa took Mary to the hospital 12 hours later. Lisa told a South Dakota social worker, Joyce Panzer, that she had been ordered to alcohol treatment because of two prior DUI's. Ms. Panzer contacted the treatment center, and was informed that Lisa had never shown up for the treatment. Mary was returned to Lisa on February 12, 1987.

On February 17, 1987, Pierre police were called to the residence of Lisa because her boyfriend, Darcy Christianson, was intoxicated and breaking windows. Lisa, at that time, had not been drinking. On March 2, 1987, during a home visit by a social worker, Lisa admitted to having gone out drinking Friday, Saturday, and Sunday, and Darcy indicated that she brought a man home on Saturday morning and three men home on Sunday morning.

Alcohol counseling and treatment were offered to Lisa at no charge, but she did not participate in the treatment program. A "dependent and neglected petition" was about to be filed against Lisa in regard to Mary when Darcy, Lisa, and Mary left the area to go to Minot, North Dakota.

By July 1988, two child abuse reports had been filed in Minot involving Lisa and Mary, one of which was substantiated. Prior thereto, in February 1988, Lisa was admitted to the Chemical Dependency Unit at St. Joseph's Hospital in Minot where she was found to suffer from severe alcohol dependence. Lisa told Ward County social worker, Karen Berg, that she had been drinking and continued to drink immediately after her in-patient treatment at St. Joseph's. Karen Berg also testified that Lisa was aware of the problems caused by her conflicts with Darcy and that Lisa indicated to her that she wasn't seeing Darcy anymore. Social service reports indicated that they were, in fact, seeing each other, still fighting, and that these conflicts were causing problems with Mary.

A chemical dependency evaluation was scheduled for Lisa for July 5, 1988. This evaluation was rescheduled by Lisa for July 19, 1988, but Lisa did not keep the appointment. Lisa stated that she missed the appointment for health reasons. On August 9, 1988, Karen Berg contacted Lisa regarding her counseling appointment. No further contact was had with Lisa by Ward County Social Services, as Lisa moved to Wahpeton in August of 1988.

Testimony of several witnesses indicated more of the circumstances regarding the abuse and neglect of Mary. Daryn Christianson, the brother of Darcy Christianson, filed a child abuse report while the parties were still in Minot because of his concerns for Mary. Daryn testified that on at least one occasion he arrived at Lisa's residence and found Mary alone and that a note was left for him indicating that he should take care of Mary that evening. The child at that time was approximately six months old and had been left alone in her crib. Gina Gisi, a friend of Lisa, testified that she had been to the home and had seen Mary fed from bottles which were dirty and described the home as being littered with cigarette packs and whole cigarettes. Gina Gisi also testified to two other significant events concerning Mary's well-being. The first was the placing of Mary in the bathtub and leaving her unsupervised. According to Gina, Lisa and Darcy "would put her

in the bathtub, fill it about half full, throw her toys in and they would go back to bed, usually." The second event of concern was a fight between Lisa and Darcy where Mary was apparently hurt.

On September 30, 1988, Mary, approximately eighteen months old, was found wandering the streets of Wahpeton by a neighbor, Carol Weitner, who described the child as having wet panties, a small t-shirt, and no shoes. After trying to locate the child's home or caretaker, Ms. Weitner contacted the police. Officer Daniel Nordick of the Wahpeton Police Department testified that he responded to the call and took Mary into his custody and contacted Social Services. He then attempted to locate Mary's caretaker. In an apartment where he noticed numerous beer cans scattered throughout, and bags of garbage, he found Darcy Christianson sleeping. After several moments of hollering, Officer Nordick succeeded in waking Darcy. Lisa was not in the apartment at that time and Darcy denied knowing her whereabouts. Mary was then left in the care of Darcy.

Later that same day, September 30, 1988, the police again became involved with the parties. Billi Jean Crooks testified that she was baby-sitting for Mary on September 30, 1988. Mary had been left at Ms. Crooks' home at approximately 1:00 p.m., and Lisa was to pick Mary up by 7:30 p.m. Ms. Crooks testified that when no one showed up to get Mary, she called around to the various bars and learned that Darcy and Lisa had taken a cab home from a local bar. Ms. Crooks went to Lisa's apartment, found Darcy and Lisa home, but asleep and unresponsive to shaking. Ms. Crooks then contacted the Wahpeton Police Department who contacted the juvenile supervisor and Social Services, and Mary was subsequently placed in foster care.

Lisa went in for treatment for chemical dependency at St. John's Hospital in Fargo on October 13, 1988, and was discharged on November 14, 1988. There is evidence to indicate that Lisa has continued to use alcohol and drugs since this last treatment. In a meeting with social worker, Connie Jensen, Lisa denied but later admitted that she had been drinking at a local bar after her Fargo treatment. Lisa testified that she had last used marijuana in December of 1988. Officer Daniel Nordick, of the Wahpeton Police Department, testified that he had seen Lisa in a local bar a week and a half before the termination hearing, which was held March 13, 1989. Lisa claims that she has not had anything to drink since January 1, 1989.

On April 10, 1989, the juvenile court issued an order terminating Lisa's parental rights. Before a court may terminate parental rights, the State must show by clear and convincing evidence that: (1) the child is a "deprived child"; (2) the conditions and causes of deprivation are likely to continue or will not be remedied; and (3) by reason of the continuous or irremediable conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. *See* section 27–20–44, N.D.C.C.; *In, Interest of L.J.*, 436 N.W.2d 558, 560 (N.D.1989).

In reviewing the decision of the juvenile court to terminate parental rights, we examine the evidence in a manner similar to trial *de novo*. In *Interest of C.S.*, 417 N.W.2d 846, 847 (N.D.1988). Our review is based upon "files, records, and minutes or transcript of the evidence of the juvenile court." Section 27–20–56(1), N.D.C.C. We afford the juvenile court's findings appreciable weight, but we are not bound by them. *Id.; In Interest of A.M.C.*, 391 N.W.2d 178, 179 (N.D.1986). We recognize, however, the juvenile court's opportunity to observe the demeanor of the witnesses. *In Interest of L.J., supra* at 560; *In Interest of J.S.*, 351 N.W.2d 440, 441 (N.D.1984).

The juvenile court determined that Mary was deprived. Under section 27–20–02(5)(a), N.D.C.C., a deprived child is a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack

of financial means of the child's parents, guardian, or other custodian."

Lisa argues that the deprivation is partly due to her lack of financial resources and lack of assistance from Social Services. The evidence reveals deprivation that has little to do with finances, such as lack of supervision of the child and lack of attention to the physical and emotional needs of the child. There was testimony that Lisa complained of financial problems. There was also testimony to the effect that Lisa did not seem to have difficulty finding the money to go to the bars or to have beer in the house. There is abundant evidence in the record to establish deprivation not primarily due to lack of financial resources. *See In Interest of D.S.*, 325 N.W.2d 654, 660 (N.D.1982).

The juvenile court found that the conditions and causes of deprivation were likely to continue or not be remedied. Evidence of the parent's background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue. *In Interest of J.N.R.*, 322 N.W.2d 465, 468 (N.D.1982). However, evidence of past deprivation is not alone enough; there must also be prognostic evidence. *Id.* We define prognostic evidence as evidence that forms the basis for a reasonable prediction as to future behavior. *In Interest of J.S.*, *supra* at 440.

Lisa contends that the State has not provided her with the assistance nor has it evaluated her in determining whether or not the conditions and causes of deprivation are likely to continue. The court relied, in part, on the report and testimony of Dr. Richard Geiselhart. His evaluation indicated that delays in verbal skill and emotional development found in Mary did not appear to be a result of any mental deficiency on the part of Mary. Dr. Geiselhart found that Mary did not show any emotional expression and did not show any sort of emotional attachment to anyone. This finding is supported by the testimony of the foster mother, Jeanne Cizek, and also the baby-sitter, Billi Crooks. Dr. Geiselhart also testified that "[u]sually with a

child of this age when there is the lack of emotional attachment, when the verbal skills are delayed as severely as they appear to be with [Mary], that's usually an indication of some severe neglect or lack of supervision."

While Dr. Geiselhart admitted that the mother may be able to provide some of the nurturing required by this child, he stated that the probability of the mother being able to provide it was very low. Dr. Geiselhart recommended that the child not be returned to the home of the natural mother. The report and testimony further indicate that the likelihood of further deprivation was significant based on the mother's past actions.

In *In Interest of J.N.R.*, *supra* at 465, this Court reversed a juvenile court's termination of parental rights. The reversal was based on the fact that the State had failed to establish by clear and convincing evidence that the conditions and causes of the deprivation were likely to continue or not be remedied. The juvenile court in *J.N.R.* pointed to the following combination of factors to support its finding that the children were deprived: "the fighting between Gregory and Barbara; the filthy living conditions in the family home; Barbara's drug problems; and Gregory's criminal record and alcohol problems." *Id.* at 468. We found that the first three factors in that case had been remedied.

Lisa contends that she has made improvements in her life. She claims that she has removed her ex-boyfriend from the home, has enrolled as a full-time student, and has attended aftercare and Alcoholics Anonymous. While there is evidence that Darcy and Lisa have separated, Lisa admitted during testimony that Darcy had spent the night with her the evening before the termination hearing. There was also evidence that the two parties are still seeing each other. Lisa failed to produce requested evidence showing her attendance at the Alcoholics Anonymous meetings. Lisa has also failed to fully exercise her visitation rights as to Mary. Lisa argues that this has been caused by her lack of finances and transportation. Lisa's residence, how-

ever, is approximately five blocks from the Law Enforcement Center where supervised visitation could be carried out at hours that were suitable to all parties. She visited her boyfriend in the Law Enforcement Center which is in the same building as the social service agency and that agency is the agency with whom she should have been making her visitation arrangements.

On December 12, 1988, a visitation schedule was established. Lisa followed that schedule for the first two days, but cancelled the next visit. On the following day her electricity was turned off and Lisa then called to cancel the next visit. Social Services offered to have the visit at its office in the Law Enforcement Center. Lisa said she would call back, but never did. Lisa's attorney handled the visitation on December 18, 1988, but no further visitation or contact was made by Lisa until January 26, 1989.

Lisa is to be commended for her enrollment in school and her attempts to improve her life, but when the mental and physical health of a child are the concerns, it is not enough that a mother indicate a desire to improve. A parent must be able to demonstrate present capability, or capability within the near future, to be an adequate parent. *See Waagen v. R.J.B.*, 248 N.W.2d 815 (N.D.1976). This, Lisa has not done.

There is also evidence in the record to satisfy the third requirement for termination of parental rights, *i.e.*, that the child

will suffer harm due to the continuance of the irremediable conditions and causes of deprivation. Dr. Geiselhart indicated in his findings that Mary is emotionally and verbally delayed. His recommendation was that the child not be returned to the home of the natural mother, as the probability of the mother being able to provide the nurturing required for the development of this child was very low. The evidence shows that Mary is not a healthy, normal child. Dr. Ron Miller characterized Mary as exhibiting the classic findings of emotional deprivation syndrome. In our view, this deprivation must not be permitted to continue merely because this mother who has failed repeatedly in the past to properly care for her child might possibly do better in the future.

■ Lisa's counsel in oral argument seemed to argue, in effect, that because Dr. Geiselhart had not interviewed, tested, or examined Lisa, his opinion was not credible as it related to Mary's future if placed in Lisa's care.

No contention was made that Lisa made herself available for such an interview, testing, or examination nor has it been asserted that she could have been required to so submit against her will. Under the circumstances and personal history evident in this case, such an interview, testing, and examination seem less significant than they normally might have been.[1]

1. The following two sections of the Child Abuse and Neglect Act are interesting, but they do not appear to resolve this issue. Sections 50–25.1–01 and 50–25.1–05, N.D.C.C., read as follows:

"*50–25.1–01. Purpose.* It is the purpose of this chapter to protect the health and welfare of children by encouraging the reporting of children who are known to be or suspected of being abused or neglected and to encourage the provision of services which adequately provide for the protection and treatment of abused and neglected children and to protect them from further harm."

"*50–25.1–05. Investigation.* The department, in accordance with rules adopted by the department, shall immediately initiate an investigation, or cause an investigation, of any report of child abuse or neglect including, when appropriate, the investigation of the home or the residence of the child, any school or child care facility attended by the child,

and the circumstances surrounding the report of abuse or neglect. If the report alleges a violation of a criminal statute involving sexual or physical abuse, the department, or the department's designee, and an appropriate law enforcement agency shall coordinate the planning and execution of their investigation efforts to avoid a duplication of factfinding efforts and multiple interviews. The department, department's designee, or appropriate law enforcement agency may interview, without the consent of a person responsible for the child's welfare, the alleged abused or neglected child and any other child who currently resides or who has resided with the alleged perpetrator. The department, department's designee, or law enforcement agency may conduct the interview at a school, child care facility, or any other place where the alleged abused or neglected child or other child is found."

We are acutely aware of the finality of an order which permanently separates a parent from her child. While the best interest of the child is not the primary consideration in a termination proceeding, it is an important factor which must be considered. *See In Interest of J.K.S.*, 356 N.W.2d 88 (N.D.1984); *In Interest of J.A.*, 283 N.W.2d 83 (N.D.1979). The needs of this child must be recognized without further delay if it is to have a reasonable opportunity to enjoy a normal life where love and care are provided on a consistent basis. We conclude from our analysis of the record that there is clear and convincing evidence to support the juvenile court's findings. Accordingly, we affirm the order of termination of parental rights.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.