495 N.W.2d 299 (1993)
In the Matter of the ADOPTION OF P.R.D.
D.L.D. and J.M.D., Petitioners and Appellees,
v.
NORTH DAKOTA DEPARTMENT OF HUMAN SERVICES and Steven D. Mottinger, Guardian ad Litem, Respondents,
R.L.H., Respondent and Appellant.
Civ. No. 920120.
Supreme Court of North Dakota.
January 22, 1993.
*300 Jean P. Hannig, Hannig Law Office, P.A., Moorhead, MN, for petitioners and appellees.
Leslie D. Johnson, Fargo, for respondent and appellant.
VANDE WALLE, Chief Justice.
R.L.H. ("Robert")[1] appealed from a district court judgment terminating his parental rights to P.R.D. ("Paul"). We affirm.
Robert and S.O. ("Susan") are the biological parents of Paul. At the time of Paul's birth in June 1991, Robert was 16 and Susan was 18. Robert and Susan have never married. At all times since his birth Paul has been in foster care or in the custody of the prospective adoptive parents, D.L.D. and J.M.D. ("David" and "Jean").
Paul is the second child born to Robert and Susan. When their first child, T.J.O. ("Thomas"), was born, Robert was 14 and Susan was 16. Susan relinquished her parental rights to Thomas, and Robert's parental rights were terminated by court order. We affirmed the termination of Robert's parental rights to Thomas in In Interest of T.J.O., 462 N.W.2d 631 (N.D.1990). *301 Thomas was subsequently adopted by David and Jean.
While pregnant with Paul, Susan decided to give the baby up for adoption and named David and Jean as prospective adoptive parents. She subsequently signed a written consent to adoption pursuant to Chapter 14-15.1, N.D.C.C. David and Jean filed a petition for adoption and sought termination of Robert's parental rights to Paul.
The court bifurcated the trial of the issues, with the first phase focusing upon termination of Robert's parental rights and the second phase focusing upon the adoption. The trial court found that Robert is presently unable to parent the child, and will be unable to parent the child for a period of four to five years. As a result, the court determined that Paul is a deprived child, that the deprivation is likely to continue, and that as a result Paul would probably suffer serious mental or emotional harm. Judgment was entered terminating Robert's parental rights and granting the adoption. Robert appealed.[2]
Termination of parental rights under the Revised Uniform Adoption Act [Ch. 14-15, N.D.C.C.] is governed by Section 14-15-19, N.D.C.C., which provides in pertinent part:
"3. In addition to any other proceeding provided by law, the relationship of parent and child may be terminated by a court order issued in connection with an adoption proceeding under this chapter on any ground provided by other law for termination of the relationship, and in any event on the ground ... (b) that by reason of the misconduct, faults, or habits of the parent or the repeated and continuous neglect or refusal of the parent, the minor is without proper parental care and control, or subsistence, education, or other care or control necessary for his physical, mental, or emotional health or morals, or, by reason of physical or mental incapacity the parent is unable to provide necessary parental care for the minor, and the court finds that the conditions and causes of the behavior, neglect, or incapacity are irremediable or will not be remedied by the parent, and that by reason thereof the minor is suffering or probably will suffer serious physical, mental, moral, or emotional harm...."
In addition to finding all of the relevant factors noted in subsection (3)(b), the district court also relied upon the grounds for termination set forth in the Uniform Juvenile Court Act, Chapter 27-20, N.D.C.C. The relevant provision, Section 27-20-44(1)(b), N.D.C.C., provides:
"1. The court by order may terminate the parental rights of a parent with respect to his child if:
* * * * * *
"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm...."
"Deprived child" is defined in Section 27-20-02(5)(a), N.D.C.C.:
"5. `Deprived child' means a child who:
"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian;"
Although the language of the respective provisions in the two chapters differs slightly, they essentially condense into the same three-part test: (1) Is the child deprived? (2) Are the conditions and causes of the deprivation likely to continue? (3) Is the child suffering, or will the child in the future probably suffer, serious physical, *302 mental, moral, or emotional harm? See McBeth v. M.D.K., 447 N.W.2d 318 (N.D.1989); In Interest of L.J., 436 N.W.2d 558 (N.D.1989).
The party seeking termination has the burden of establishing each of the three factors by clear and convincing evidence. In Interest of L. J., supra; Pritchett v. Executive Director of the Social Service Board, 325 N.W.2d 217 (N.D.1982). Our standard of review under either the Adoption Act or the Juvenile Court Act is similar to trial de novo. Pritchett v. Executive Director of the Social Service Board, supra. We briefly outlined the standard of review in McBeth v. M.D.K., supra, 447 N.W.2d at 320:
"In reviewing the decision of the juvenile court to terminate parental rights, we examine the evidence in a manner similar to trial de novo. ... Our review is based upon `files, records, and minutes or transcript of the evidence of the juvenile court.' ... We afford the juvenile court's findings appreciable weight, but we are not bound by them.... We recognize, however, the juvenile court's opportunity to observe the demeanor of the witnesses."
Robert asserts that the court erred in finding that Paul is a deprived child, because Paul has at all times received proper and appropriate care while in foster care and while in the custody of David and Jean. We rejected this precise argument in Robert's prior appeal in In Interest of T.J.O., supra, 462 N.W.2d at 633:
"The definition of a deprived child is broad enough to encompass a child whose parent, while never having had the opportunity to care for the child, is shown to be presently incapable of providing proper parental care for the child.... A child may be found to be a deprived child with regard to a parent even though that child has at all times received adequate foster or other proper care from a source other than that parent.... Prognostic evidence may be relied upon to find that a child is a deprived child if it shows that the parent, although not having custody of the child, would be presently unable to supply physical and emotional care for the child, with the aid of available social agencies, if necessary, and that the inability would continue for sufficient time to render improbable the successful assimilation of the child into a family if that parent's rights were not presently terminated." [Citations omitted.]
It is undisputed that Robert is presently unable to parent Paul. The trial court found that Robert is a severely troubled seventeen year-old who does not have the ability or capacity to care for himself, and clearly lacks the ability to care for an infant child. Robert is currently in the custody of the Division of Juvenile Services and is housed at Home on the Range, a juvenile detention facility in Beach, North Dakota. He would not be allowed to keep Paul with him at Home on the Range. There was extensive testimony indicating that Robert lacks even the most rudimentary parenting skills. By his own optimistic estimate, Robert believed that he would be able to effectively parent Paul when Robert is 19 or 20, a period of two to three years from the date of trial. By that time, Paul will be four years old.
There is clear and convincing prognostic evidence to support the court's finding that Paul is a deprived child.
The evidence also clearly and convincingly establishes that the conditions and causes of the deprivation are likely to continue and will not be remedied. Robert makes an attention-getting argument implying that the courts favor youthful mothers as opposed to youthful fathers on this issue. Thus Robert's brief states:
"It is interesting to note that had the natural mother chosen not to terminate her rights to [Paul], there would have been no question that she would have the primary rights to parent this child. She would have also had available to her all the resources necessary to aid her in that care. This would hold true if the natural mother were thirteen, sixteen, or eighteen.
"If the natural father had requested to terminate his parental rights to this child *303 and then proceeded in the manner which the natural mother did in this case to place that child in an adoptive home, the court would more than likely not allow such a separation between the mother and the child. If the mother asserted her desire to parent the child, the court would defer to her superior parental right. In the same respect, the natural father in this case has the same right to parent."
Not only is there no evidence in the record to support this allegation, but Robert's history belies the contention that it is his maleness which prompted the court to terminate his parental rights. The record is replete with prognostic evidence about Robert's inability to parent the child and the dim prospects for improvement in the foreseeable future, irrespective of gender.
Most striking in this regard is Robert's total lack of progress in the two years between the two termination hearings. While fathering a child at age fourteen would be a sobering experience for most, Robert has recklessly and irresponsibly fathered a second child out of wedlock. He has been expelled from school. Most significantly, his extensive run-ins with legal authorities, dating back to when he was eight years old, have continued. In February 1990 he was placed on probation for burglary. In February 1991 he was committed to the Division of Juvenile Services when found guilty of criminal mischief. In October 1991 Robert was found guilty on additional burglary and criminal mischief charges, and at that time was sent to Home on the Range.
The evidence in the prior termination action established that Robert would not have the maturity level, the parenting knowledge, or the commitment to assume parental responsibilities for at least another four or five years. See In Interest of T.J.O., supra. Nothing which has occurred in the two years since that assessment suggests that Robert has made any significant progress or is any closer to those goals. The court-appointed psychologist in this case testified that it would be "more than five years" before Robert would be capable of adequately parenting Paul, and the court found that Robert would not realistically have the ability to parent Paul for at least four to five years. We conclude that the evidence clearly and convincingly established that the conditions and causes of Paul's deprivation will continue and will not be remedied in the foreseeable future.
There is also extensive evidence to support the court's finding that Robert's continuing inability to parent Paul during his developmental years would probably result in serious mental and emotional harm to Paul. The probability of serious mental and emotional harm to the child may be established by prognostic evidence that the parent's inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated. See, e.g., In Interest of T.J.O., supra; In Interest of L.J., supra; In Interest of J.A.L., 432 N.W.2d 876 (N.D.1988).
In In Interest of T.J.O., supra, we relied upon evidence that Robert would not be able to care for Thomas in the reasonably foreseeable future, in that case four to five years, to conclude that the child would suffer serious mental or emotional harm if Robert's parental rights were not immediately terminated. This case is indistinguishable. The evidence established that Robert will be unable to properly care for Paul for at least five years. We conclude that the evidence clearly and convincingly established that Paul will probably suffer serious mental or emotional harm if Robert's parental rights are not terminated.
Robert asserts that the court erred in failing to consider the "secondary sources" available to assist him in caring for Paul. Specifically, Robert asserts that his father and sister will be able to assist in caring for Paul.
We considered and rejected an identical argument about this family's ability to assist Robert's parenting in In Interest of T.J.O., supra, noting especially the lack of parental control over Robert by his parents. In this case, there was extensive evidence regarding the dysfunctional nature of Robert's family. The trial court *304 found, with ample support in the record, that "[Robert's] family, in particular his father ... and his sister ..., are not suitable to parent the minor child because of their dysfunctional family system, their serious health problems, their minimization of legal problems, and their failure to accept responsibility or solve problems."
Equally important in this case, however, is the nature and extent of the assistance contemplated. As described by Robert, his father, and his sister, the assistance here would not be so much a "secondary source" of support, but rather is more in the nature of permanent substitute parenthood by the father and sister. Consideration of secondary sources of assistance may be appropriate where such assistance is temporary and leads to the biological parent acquiring sufficient parenting skills within a reasonable period of time. See In Interest of J.A.L., supra. It is inappropriate, however, to consider such secondary sources when they amount to other family members serving for an extended period of time as de facto parents in place of the biological parent. The focus must be upon the parent's ability to take over primary care of the child within a reasonable period of time. The evidence in this case indicates that, even with family assistance, Robert will not have that ability for at least five years.
We conclude that the court did not err in terminating Robert's parental rights. The judgment is affirmed.
MESCHKE, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.
Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and serves as surrogate judge for this case pursuant to Section 27-17-03, N.D.C.C.
Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.
Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision.
LEVINE, Justice, concurring specially.
While I agree with most of what is said in the majority opinion, I write specially to anticipate the case in which a loving, able family member or members does serve as a de facto parent until the juvenile parent, also a loving, able child, becomes qualified by age and experience to assume the responsibilities of parenthood on his or her own. See Patzer v. Glaser, 396 N.W.2d 740 (N.D.1986); see also Patzer v. Glaser, 368 N.W.2d 561 (N.D.1985) (Levine, J., and Meschke, J., dissenting). I do not read the majority opinion to preclude such an outcome and so I concur in the opinion.
NOTES
[1] All names are pseudonyms.
[2] Robert's notice of appeal states that he is appealing from the "Notice of Entry of Judgment." We will treat the attempted appeal from the notice of entry of judgment as a proper appeal from the previously entered judgment. See, e.g., First State Bank of New Rockford v. Anderson, 452 N.W.2d 90 (N.D.1990); Vanderhoof v. Gravel Products, Inc., 404 N.W.2d 485 (N.D.1987).