In the Interest of J.L.D., a Child.

Twila NOVAK, Petitioner and Appellee,

v.

J.L.D., said child; T.L.D., mother; Respondents,

and

R.G., father, Respondent and Appellant.

Civ. No. 950029.

Supreme Court of North Dakota.

Oct. 31, 1995.

---

Cynthia W. Goulet (argued), Assistant State's Attorney, Grafton, for petitioner and appellee.

Thompson & Thompson, Devils Lake, for respondent and appellant; argued by Scott R. Thompson.

MESCHKE, Justice.

R.G. (hereafter Richard, a pseudonym) appeals a judgment terminating his parental rights to J.L.D. (hereafter Jay, a pseudonym). We conclude that clear and convincing evidence supported the termination, and we affirm.

Jay was born on January 7, 1994. His mother, T.L.O. (hereafter Toni, a pseudonym), petitioned on April 15, 1994, to voluntarily terminate her parental rights, and those of Richard, alleged in her petition as the father. The trial court gave temporary custody to Walsh County Social Services. That agency placed Jay in a foster home, where he has remained since.

Richard was notified on June 10, 1994, that blood tests confirmed his paternity. Richard indicated his intention to seek custody on June 24, 1994, but was arrested for forgery and taken into custody on July 1, 1994. On August 31, 1994, a jury convicted Richard of three counts of forgery committed between January 20, 1994 and July 1, 1994. Richard was sentenced to the state penitentiary on October 5, 1994, with an expected release date of July 1996.

On October 10, 1994, the trial court allowed Toni to withdraw her voluntary petition. On October 13, 1994, Twila Novak, Interim Director of Walsh County Social Services, petitioned for involuntary termination of Toni's and Richard's parental rights.

After trial, the trial court terminated Toni's and Richard's parental rights on January 23, 1995. The court found that Jay was a deprived child, that the deprivation was likely to continue, and that Jay "will suffer or will probably suffer serious mental or emotional harm due to the deprivation." Only Richard appeals from the judgment.

The Uniform Juvenile Court Act, NDCC ch. 27–20, authorizes termination of parental rights in certain cases. In cases other than abandonment or parental consent, the court can only terminate if the "child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm . . . ." NDCC 27–20–44(1)(b). This statute thus creates a "three-part test: (1) Is the child deprived? (2) Are the conditions and causes of the deprivation likely to continue? (3) Is the child suffering, or will the child in the future probably suffer, serious physical, mental, moral, or emotional harm?" *Matter of Adoption of P.R.D.*, 495 N.W.2d 299, 301–02 (N.D. 1993). As the case of *In Interest of D.R. and B.R.*, 525 N.W.2d 672, 673 (N.D.1994), illustrates, the petitioner must prove all three parts by clear and convincing evidence.

Richard argues that the petitioner failed to prove, by clear and convincing evidence, the three necessary parts. He asks that we reverse the termination and send the case back to the trial court "for a finding that if the child is deprived that he be placed in foster care until such time as Richard is released from the penitentiary, [and] can obtain the counselling and classes necessary for the assimilation of Jay and Richard into a proper home."

We review a juvenile court decision "upon the files, records, and minutes or transcript of the evidence of the juvenile court," and we give "appreciable weight" to the findings of that court. NDCC 27–20–56(1). As we explained in the case of *In Interest of N.W.*, 510 N.W.2d 580, 581 (N.D.1994), "[a]lthough we examine the evidence in a manner comparable to the former procedure of trial de novo, we give deference to the juvenile court's decision, because that court has had the opportunity to observe the candor and demeanor of the witnesses."

### 1. *Deprivation?*

■ Richard argues that there is not clear and convincing evidence that Jay is deprived. We disagree.

A "deprived child" is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents...." NDCC 27–20–02(5)(a). Richard argues that "the fact that [he] is incarcerated should not have a bearing on the case." We have explained before, though, that "[t]he definition of a deprived child is broad enough to encompass a child whose parent, while never having had the opportunity to care for the child, is shown to be presently incapable of providing proper parental care for the child." *In Interest of T.J.O.*, 462 N.W.2d 631, 633 (N.D.1990); *see also In Interest of R.M.B.*, 402 N.W.2d 912, 918 (N.D.1987). Here, Richard is presently imprisoned, with an expected release date of July 1996, and he therefore cannot now provide for Jay's "physical, mental, or emotional health." NDCC 27–20–02(5)(a). We agree with the trial court that Richard's assertion that he might be granted an early parole release is "speculative, particularly in light of his prior conduct while on probation and his past display of [in]ability to follow rules set out for him."

■ Richard claims Jay has "benefitted from being placed in the foster home," "there is no damage being done to the child at the present time as the child has been improving in the foster home," and thus implicitly argues this effective foster care forecloses a finding of deprivation. Precedent clarifies, however, that a child can be "deprived" even if that child "has at all times received adequate foster or other proper care from a source other than that parent." *T.J.O.*, 462 N.W.2d at 633; *see also P.R.D.*, 495 N.W.2d at 302 (rejecting similar argument); *In Interest of K.P.*, 267 N.W.2d 1, 4 (N.D.1978) (same). An agency's efforts to salvage a child's life does not forgive the parental conduct that has caused the deprivation.

Richard also argues that "any and all deprivation ... was due to Toni's neglect and should not be blamed on [him]," that he "has had no contact with [Jay] so the deprivation cannot be blamed on him," and that, because he was not known to be Jay's father until he was adjudicated as the father on June 28, 1994, "anything that he did prior to that time should not be held against him." Except under unusual circumstances not present here, it is perplexing how a parent can suggest that his complete lack of contact with his child prevents a finding of deprivation. While Toni may be equally responsible for Jay's deprivation, it is evident that Jay is presently deprived of physical and emotional support from Richard, and will not receive it for some time, primarily because Richard's voluntary criminal activity put him in prison. Like the troubled teen-age parent with the history of juvenile probation reflected in *T.J.O.*, 462 N.W.2d 631, and later in juvenile detention in *P.R.D.*, 495 N.W.2d 299, Richard is presently unable to care for Jay, and will be unable to do so for some time.

Countering the trial court's finding that Jay's deprivation was caused by Richard's "voluntary acts," Richard argues that his crimes should not be considered because they "were committed prior to Richard learning that he was the natural father of Jay." This assertion, however, doesn't fit this record. While the criminal acts for two of his three convictions took place before paternity tests proved that Richard was Jay's father on June 10, 1994, Richard's criminal record discloses that the third act took place on July 1, 1994. Although Richard argues that July 1, 1994 is merely the arrest date, not when the criminal act actually occurred, the record is otherwise. The criminal information and the presentence report both tell us that Richard committed the third offense on July 1, 1994.

Also, Toni testified that Richard knew of her pregnancy in May 1993, and that she immediately told him that he could be the child's father. Richard thus knew that he could be Jay's father before he committed any of the crimes that put him in prison.

We conclude the evidence clearly and convincingly proves that Jay is deprived.

## 2. *Likely to Continue?*

■ Even if Jay is deprived, Richard argues there is not clear and convincing evidence that the causes and conditions of the deprivation are likely to continue. We disagree.

■ Evidence of past or present deprivation alone is not enough to terminate parental rights, but "[e]vidence of the parent's background ... may be considered in determining whether deprivation is likely to continue." *McBeth v. M.D.K.*, 447 N.W.2d 318, 321 (N.D.1989). Specifically, prognostic evidence can be used to show that the parent's present inability to care for the child "would continue for sufficient time to render improbable the successful assimilation of the child into a family if that parent's rights were not presently terminated." *T.J.O.*, 462 N.W.2d at 633; *see also In Interest of J.A.L.*, 432 N.W.2d 876, 878 (N.D.1988). As we recognized in *McBeth*, 447 N.W.2d at 321, "prognostic evidence" is evidence that "forms the basis for a reasonable prediction as to future behavior."

Richard argues that, even if he is not released until July 1996, the testimony of Shirley Hoffarth, a licensed social worker and adoption counselor, shows that "bonding between parent and child can take place after the first year after birth" even if it "may be difficult," that "older children to the ages of 5 and 6 are adoptable with reasonable success," and that "it would have to be a slow process with any parent with whom they would attempt to place Jay" because Jay's foster family is unwilling to adopt him. Richard asserts that Jay would not be harmed by remaining in foster care. After his release, Richard argues, he could access those

> services available to single parents supplied by the State which are not gender based. Those include food stamps, WIC, housing assistance, [and] AFDC.... Thus, with the support of the State on either a temporary or a long-term basis, Richard would be able to supply a house for Jay. The other social programs that are readily given to single mothers would be available to him wherein he would have

assistance with food, nutritional development, and also family counseling.

Although Richard concedes he lacks parenting skills, he contends that he could attend parenting classes while in prison, and that social services should provide parenting assistance.

Richard's arguments are blind to the problems of long-term foster care. Jay entered foster care when he was three months old, and he will be at least two and a half years old when Richard returns from prison. What is more, Richard and Jay could not be united quickly even then. Richard would first have to stabilize his life and establish a home for Jay. Then, as Shirley Hoffarth testified, it "would have to be a very gradual reentering of [Richard] into [Jay's] life," a fact that Richard concedes. Even after Richard's release, it is unclear how soon Jay could be successfully assimilated into Richard's life.

We have held before that " 'long term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the child[ ] to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care.' " *D.R.*, 525 N.W.2d at 675 (quoting *In Interest of C.K.H.*, 458 N.W.2d 303, 307 (N.D.1990)); *see also In Interest of J.K.S.*, 356 N.W.2d 88, 92 (N.D.1984). The testimony of Kathryn Kenna, a licensed social worker and Jay's foster mother, shows that Jay is already dangerously attached to his foster family and particularly at risk in this way. To make Jay wait until an uncertain point in the future to begin adjusting to a new family would surely occasion an unreasonably severe dislocation from his existing emotional attachments.

Richard also evades the grave problems implicit in making a deprived child assume the risks of waiting to see if a parent can turn his or her life around to become adequate for the parental role. Richard's extensive criminal history, beginning in 1981, includes nearly twenty misdemeanor and felony convictions and several imprisonments. Richard has violated his probation at least three times, twice resulting in revocation of probation.

To compound these problems, Richard has been diagnosed with an antisocial personality disorder. A psychological evaluation, prepared by Dr. Myron Veenstra, makes this assessment:

Individuals who respond in a manner like [Richard] are impulsive and immature. They are rebellious, self-centered and tend to show bad judgement. As a consequence, they are often in legal difficulties. In spite of their trouble with the law, they tend to blame others for their difficulties and do not learn from their mistakes. Such personality patterns show little change over time.... As they are basically happy with themselves and their approach to life, they are not motivated for change. They do not respond well to therapy and would only stay with therapy if under some duress or by court order.... Information gathered from interviewing [Richard] as well as results of personality testing suggests that [Richard's] inclination to engage in unlawful acts is likely to continue. He does not take responsibility for criminal involvement and does not suggest any remorse.

This assessment reasonably predicts Richard's past irresponsible conduct will probably continue.

As the trial court found, Richard's criminal history, coupled with his antisocial personality disorder, is "prognostic evidence that [Richard's] ability and willingness to comply with the law in the future [are] questionable," and "supports a finding that [Richard] will unlikely be able to provide a long stable environment in the near future [for Jay], even with support services." We too conclude that the risk of further imprisonment for Richard is very high.

The trial court, with the opportunity to observe the candor and demeanor of the witnesses, made pertinent additional findings that we adopt: Richard has not maintained a "stable home" during most of his eight years of adult life, with his "primary residence" being the Grand Forks City Mission; Richard has not sought steady employment despite his Tourette's Syndrome being in remission for the past five years; Richard has "borderline intelligence" that affects his abili-

ty to learn and provide the "appropriate minimum level of nurturing and care" for Jay; Richard has "shown no improvement in his life" since becoming an adult, and his "maturity level remains inadequate to take on the parenting needed for [Jay's] welfare"; Richard's "commitment to parenting" is contradicted by his failure to offer support to Toni during the pregnancy, by his missing sessions with social services, and by his failure to initiate visitation with Jay; and Richard does not have secondary support from his family to help him care for Jay, either before or after his release. We conclude that Richard's present inability to give necessary care to Jay will probably continue.

However commendable may be Richard's desire to change his life and to learn how to become a parent for Jay, we are unwilling to let Jay suffer the predictable consequences when it turns out that Richard is unable, unwilling, or unavailable to do so. *See C.K.H.,* 458 N.W.2d at 307 ("Although there is some evidence that with long and intensive therapy and assistance, John and Tina might be able to learn and apply proper parenting skills, their children cannot be expected to wait and assume the risks involved."); *see also D.R.,* 525 N.W.2d at 675 (following *C.K.H.); McBeth,* 447 N.W.2d at 322 ("when the mental and physical health of a child are the concerns, it is not enough that a mother indicate a desire to improve"); *McBeth v. J.J.H.,* 343 N.W.2d 355, 360 (N.D.1984) ("To terminate parental rights, a court need not await the happening of a tragic event."). As Shirley Almen, Jay's guardian ad litem put it, Jay "would be expected to try and be the miracle that will change [Richard's] behavior and attitude, but there is no guarantee" of a miracle.

We conclude there is clear and convincing evidence that the causes and conditions of Jay's deprivation are likely to continue.

3. *Harm?*

██ Finally, Richard argues, even if there is deprivation that is likely to continue, there is not clear and convincing evidence that it "would cause severe emotional harm" to Jay. We disagree.

Richard argues that Jay is "benefitting" from foster care, that children are adoptable "at a later age," that assimilation can be accomplished here, and that Richard's psychological evaluations indicate that Richard "would be capable of taking care of the child." Thus, Richard contends, the only reason the trial court terminated his parental rights is "due to the fact that he is presently incarcerated," because social services would otherwise "have had an obligation to offer Richard the programs and financing available to any single parent in the hopes to leave the child in the home." Richard cites *In Interest of J.N.R.*, 322 N.W.2d 465, 469 (N.D.1982), where we noted that "we do not believe that the mere fact that one has a history of difficulties with the law, *by itself,* clearly and convincingly establishes continuing deprivation." (emphasis added). We agree that imprisonment alone does not justify parental termination. *Matter of Adoption of J.S.P.L.,* 532 N.W.2d 653, 664 (N.D.1995). But this is not a case where the parent's imprisonment is the only justification for termination.

In addition to Richard's present imprisonment, his criminal history and his antisocial personality disorder create a strong probability that he will be in prison again in the future. Richard has expressed a desire to improve, and might access beneficial social service programs, but his ability to accept responsibility and his commitment to parenting are quite doubtful. *See T.J.O.,* 462 N.W.2d at 634; *C.K.H.,* 458 N.W.2d at 306–07. While Richard might be able to provide Jay's bare physical needs, Richard's personality disorder and borderline intelligence impair his ability to learn the other necessary parenting skills.

Jay is in a critical stage in his life. According to Shirley Hoffarth:

For [Jay] it could be drastic because the most formative years of a child are those first three years of his life. And we're talking about almost the first year already when a child learns to love, to trust, to bond.... But the longer it takes, the greater the transition is going to be for him.

Not surprisingly, Jay has already developed strong emotional attachments with his foster family. Continuing foster care indefinitely will only solidify and magnify these attachments, making his eventual dislocation more traumatic and placing his later assimilation into a permanent family at greater risk. That is the serious mental and emotional harm that Jay will probably suffer.

We agree with the trial court that "continued foster care ... would [not] be good for [Jay's] emotional or mental health, but instead will create severe problems for him that are likely to [a]ffect him forever and be detrimental to his happiness and well being." *See McBeth,* 447 N.W.2d at 323 ("The needs of this child must be recognized without further delay if it is to have a reasonable opportunity to enjoy a normal life where love and care are provided on a consistent basis.").

We conclude that there is clear and convincing evidence that Jay will probably suffer serious mental or emotional harm. We affirm.

VANDE WALLE, C.J., and
SANDSTROM, NEUMANN and LEVINE, JJ., concur.