1998 ND 129

In the Interest of L.F. and J.F., Children.

Earle R. MYERS, Jr., Richland County State's Attorney, Petitioner and Appellee,

v.

J.H., Parent of said Children, Respondent and Appellant.

L.F. and J.F., Children, and D.F., Parent of said Children, Respondents.

Civil No. 970313.

Supreme Court of North Dakota.

June 30, 1998.

Mark A. Meyer (argued), of Meyer Law Firm, Wahpeton, for respondent and appellant.

Earle R. Myers (argued), State's Attorney, Wahpeton, for petitioner and appellee.

Janel B. Fredericksen of Smith & Strege, Wahpeton, for respondents.

MARING, Justice.

[¶ 1] J.H. (Janet),[1] the mother of the minor children, L.F. (Laura) and J.F. (Jennifer), appeals from a juvenile court order terminating all of her parental rights and obligations to her two daughters. The minor children's father, D.F. (Darrell), did not appeal the juvenile court's decision terminating his parental rights. We conclude the juvenile court's order terminating parental rights was supported by clear and convincing evidence. We affirm.

I

[¶ 2] Janet and Darrell, although not married to each other, lived together for approximately six years in South Dakota and had two children, Laura who was born on February 10, 1991, and Jennifer who was born on August 26, 1993. From the record below, it appears Janet and Darrell's household was fraught with domestic violence, alcoholism, and abuse. In July 1994, Darrell was referred to a mental health center by the Watertown Child Protection Services as a result of domestic violence and several child abuse or neglect reports. Sometime in early 1996, Janet left Darrell and moved out of the household leaving Darrell with sole custody of Laura and Jennifer for about six months. In July 1996, a South Dakota court granted custody of the children to Janet. Apparently, Janet then moved around with the children, eventually residing with an acquaintance in Richland County, North Dakota.

[¶ 3] A Richland County social worker first became involved with Janet and her children on September 10, 1996, after investigating a report that the children had been sexually abused by an adolescent who lived with them in the home. In mid-September, social services attempted to provide Janet and her children counseling and a parental aide in the home. Janet, however, did not show up for a counseling appointment and was kicked out

1. All names of the parties in this case are pseudo- nyms.

of her residence the day the in-home assistance was to begin. On September 26, 1996, social services received another report of child abuse or neglect regarding Janet and her children after Janet stopped at a local tavern with Laura and Jennifer asking for food for the children.

[¶ 4] Soon thereafter, Janet requested that Richland County Social Services place her two children in foster care as she was no longer able to provide and care for them. On September 27, 1996, the Juvenile Supervisor for Richland County issued an Order for Temporary Shelter Care regarding Laura and Jennifer. On September 30, 1996, a shelter care hearing was held before the juvenile court and an Order for Further Shelter Care was issued.

[¶ 5] On October 15, 1996, the State's Attorney filed a petition alleging the children were deprived and requested a hearing for the juvenile court to make an appropriate order of disposition. The juvenile court appointed Lisa Stenehjem as the guardian ad litem for the children.

[¶ 6] On November 21, 1996, a hearing was held, and both parents appeared with their respective attorneys. The mother denied the allegations in the petition. The juvenile court then ordered the hearing on the petition be continued until December 11, 1996, and also ordered the mother undergo a parental capacity and psychological evaluation with Dr. Rick Ascano, a clinical psychologist. Pending the December hearing, the juvenile court ordered the children to remain in foster care, allowing visitation by the mother. The December 11, 1996, hearing was continued until the completion of Dr. Ascano's report, which was eventually completed on January 7, 1997. On February 3, 1997, the juvenile court issued a Temporary Order, and again continued the hearing pending completion of Lisa Stenehjem's home study of the mother.

[¶ 7] On February 19, 1997, a hearing was again held on the petition. At this hearing, the mother stipulated to the petition as amended. The juvenile court issued its Findings of Fact and a Temporary Order of Disposition. In its findings, the juvenile court determined the children were without the proper parental care or control necessary for their physical, mental, emotional health, or morals.[2] The juvenile court also found the parents were unable at that time to provide the necessary proper parental care or control. The Temporary Order essentially provided for the children to remain in foster care for up to six months; for the mother to have frequent supervised visitation and, if deemed appropriate, unsupervised visitation; for social services to assist the mother in receiving counseling; for the mother to follow the recommendations of Dr. Ascano's report; and for reasonable efforts to be made to return the children to their mother.

[¶ 8] On June 27, 1997, the Richland County State's Attorney filed a Petition to Termi-

2. The juvenile court found in particular:

1. That the mother of said children has been unsuccessful, for purposes of raising her children, in obtaining suitable and permanent housing or to obtain employment in the State of North Dakota and has established temporary residence in the State of North Dakota;

2. That said children, by their parents['] own admission, have been subjected to witnessing domestic violence between the parents creating an environment detrimental to the children's well-being;

3. That [Jennifer] is known to have asthma and has been seriously ill recently. Although tobacco smoke exposure aggravates [Jennifer's] asthma symptoms[,] the mother ... continues to smoke tobacco products; although she is willing to abstain from tobacco use in the presence of her children;

4. That the mother of said children has been evaluated by [Dr. Ascano]. Dr. Ascano reported that, among other things, the children are in profound risk of psychological neglect if returned to the custody of their mother due to the mother's sub-average parenting skills and lack of stress coping capabilities and further noted that the children should remain in foster care placement until such a time the mother's parenting skills and ability to manage stress has improved substantially;

5. That in [September 1996], counseling sessions had been scheduled for the mother and often times she was late and did not appear and failed to understand the significance of the aforementioned appointments;

....

9. That the deprivation complained of is not due primarily to the lack of financial means of the parents of said children.

nate Parental Rights because the mother had substantially failed to meet the conditions of the Temporary Order. On July 30, 1997, a hearing was held on the Petition to Terminate Parental Rights. The children's father chose not to be present at the termination hearing, but his attorney appeared on his behalf. At the hearing, the State's Attorney called four witnesses: Dr. Ascano; two Richland County social workers; and the current foster mother to the children. The mother also presented her own testimony in addition to the testimony of her current fiancé. At the conclusion of the testimony, the juvenile court issued its Findings of Fact and Order Terminating Parental Rights. The juvenile court found the children to be deprived and without proper care or control, subsistence, education required by law, or other care or control necessary for their physical, mental, or emotional health or morals.[3] The juvenile court also determined that the conditions and causes of the deprivation were likely to continue or would not be remedied, and that by reason thereof, the children were suffering and in the future would probably suffer serious physical, mental, moral or emotional harm. Janet appeals the order terminating parental rights and requests this Court to reverse the order and remand to the juvenile court for further proceedings.

## II

 [¶ 9] We have previously asserted that "[c]ases involving the termination of parental rights are always difficult, especially when there has been no claim of intentional deprivation." *In Interest of D.S.*, 325 N.W.2d 654, 659 (N.D.1982). This case is indeed no exception. It is a well-established principle that parents have a fundamental, natural right to their children which is of constitutional dimension. *In Interest of L.J.*, 436 N.W.2d 558, 561 (N.D.1989). This constitutional protection ensures parental rights may not be terminated "merely because a parent lacks the skill to optimize a normal child's potential." *Id.* A parent's constitutional right, however, is not absolute, and a parent must at least provide care that satisfies the minimum community standards. *Id.* "Any doubts should be resolved in favor of the natural parent[,] and parental rights should be terminated only when necessary for the child's welfare or in the interest of public safety." *Asendorf v. M.S.S.*, 342 N.W.2d 203, 207 (N.D.1983).

 [¶ 10] The Uniform Juvenile Court Act, N.D.C.C. ch. 27–20, authorizes the termination of parental rights in certain cases. In cases other than abandonment or parental consent, the court may terminate the parental rights only if "[t]he child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." N.D.C.C. § 27–20–44(1)(b). This statute, therefore, creates the following three-part test for determining whether the juvenile court may terminate parental rights: 1) Is the child deprived? 2) Are the conditions and causes of the deprivation likely to continue? 3) Is the child suffering, or will the child in the future probably suffer, serious physical, mental, moral, or

---

3. The juvenile court found in particular:

1. That although [Janet] has been encouraged to visit her children as frequently as possible so that reunification could occur, she has only visited her children a total of six (6) times since [February 19, 1997], and that those visitations were generally 20–30 minutes in duration, moreover, this lack of contact, in the great majority of instances, was not due to circumstances beyond the control of [Janet]. That [Janet] had been repeatedly informed that she needed to meet with her children at least 3 or 4 times per week in order that bonding and reunification could occur;

2. That since February[ ] 19, 1997, [Janet] has been Ordered to attend counseling and she has only been to the Hope Unit at Breckenridge, Minnesota, five (5) times, and has missed at least three (3) scheduled appointments, moreover, these failures to schedule or to attend counseling, in the great majority of instances were not due to circumstances beyond the control of [Janet], that because of [Janet's] failure to attend or schedule counseling, the Hope Unit indicated to Richland County Social Services that no more advanced scheduling could be undertaken and scheduling would need to occur the day before any scheduled appointment;

. . . .

emotional harm? *See In Interest of J.L.D.,* 539 N.W.2d 73, 75 (N.D.1995). The state must prove these elements by clear and convincing evidence. *Id.*

[¶ 11] Janet argues the state failed to prove by clear and convincing evidence the conditions and causes of the deprivation are likely to continue or will not be remedied. Janet further argues the county social service agency did not make affirmative and diligent efforts to assist her in being reunited with her children. We disagree.

■ [¶ 12] On appeal, we review the juvenile court's decision to terminate parental rights and examine the evidence in a manner similar to a trial de novo. *L.J.,* 436 N.W.2d at 560. We review the "files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." N.D.C.C. § 27–20–56(1). Although we are not bound by the juvenile court's findings, we recognize the juvenile court's "opportunity to observe the candor and demeanor of the witnesses." *J.L.D.,* 539 N.W.2d at 75.

## A. Deprivation

■ [¶ 13] In its Findings of Fact for both the Temporary Order of Disposition and the Order Terminating Parental Rights, the juvenile court determined Laura and Jennifer were deprived children. Janet does not contest these findings on appeal. A "deprived child" is statutorily defined as one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27–20–02(5)(a).

[¶ 14] The juvenile court determined the two children suffered abuse and neglect at the hands of their parents. There is evidence of an unstable living environment for the children wherein the mother moves frequently and has problems holding a job. There are previous reports made to various social service agencies regarding the neglect and abuse of these children. In September 1996, Janet invited state intervention by surrendering custody of her children to social services. *See In Interest of J.S.,* 351 N.W.2d 440, 442 (N.D.1984) (stating a voluntary invitation for state intervention lessens the necessary "triggering circumstances" for application of the Juvenile Code). She requested the children be placed in foster care as she was unable to provide the necessary care or control for her children's physical, mental, or emotional needs. Furthermore, at the February 19, 1997, hearing, Janet stipulated to the petition as amended, thereby acknowledging her children came within the provisions of the Uniform Juvenile Court Act, N.D.C.C. ch 27–20, as deprived children, and that such deprivation was not primarily due to the lack of financial resources. *See In Interest of A.M.A,* 439 N.W.2d 535, 538 (N.D. 1989) (finding the parent could not dispute the initial deprivation where there was a signed stipulation acknowledging the children were deprived).

[¶ 15] Based upon Janet's own testimony and the record of this case, we conclude the evidence is clear and convincing Laura and Jennifer are deprived children and this deprivation is not primarily due to lack of financial resources.

## B. Likely Continuing or Unremedied Deprivation

■ [¶ 16] Janet argues the state failed to prove by clear and convincing evidence the deprivation is likely to continue or will not be remedied. Evidence of the parent's background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue. *J.L.D,* 539 N.W.2d at 77; *In Interest of J.H.,* 484 N.W.2d 482, 484 (N.D.1992). Evidence of past or present deprivation, however, is not alone sufficient to terminate parental rights, rather there must be prognostic evidence. *J.L.D.,* 539 N.W.2d at 77; *In Interest of R.M.B.,* 402 N.W.2d 912, 918 (N.D.1987). We have defined prognostic evidence as "evidence that forms the basis for a reasonable prediction as to future behavior." *McBeth v. M.D.K.,* 447 N.W.2d 318, 321 (N.D.1989).

■ [¶ 17] Prognostic evidence must demonstrate the parent is presently unable

to provide physical and emotional care for the child, with the aid of available social agencies if necessary, and that this "inability to care for the child 'would continue for sufficient time to render improbable the successful assimilation of the child into a family if that parent's rights were not presently terminated.'" *J.L.D.*, 539 N.W.2d at 77; *J.H.*, 484 N.W.2d at 484. Additionally, a lack of parental cooperation is pertinent in determining whether deprivation will continue. *R.M.B.*, 402 N.W.2d at 918. Although we are cognizant of the dangers of allowing social workers to determine how a family will be run, the juvenile court may properly consider a parent's cooperation or lack of cooperation with social workers. *Id.*

[¶ 18] In this case, we find ample prognostic evidence the deprivation of Laura and Jennifer is likely to continue unless parental rights are terminated. Furthermore, the juvenile court determined the conditions and causes of deprivation of the children are likely to continue or will not be remedied.

[¶ 19] The juvenile court in its February 19, 1997, Temporary Order of Disposition required Janet to follow the recommendations made by Dr. Ascano in his evaluation dated January 7, 1997. The Temporary Order also required her to cooperate with social services in facilitating her visitation with her children, to obtain suitable housing, and to obtain appropriate counseling.

[¶ 20] Dr. Ascano recommended counseling and frequent visitation by Janet with her children of three to four times per week. The testimony indicated Janet visited the children only six times over approximately a five month period despite encouragement from social services to exercise her visitation.

[¶ 21] The evidence shows Janet was to see Dr. O'Laughlin for counseling. In March 1997, she missed both of her scheduled appointments. In April and May 1997, she failed to even schedule any appointments. Three appointments were scheduled for June of which she kept two, and six appointments were scheduled for July of which she kept two and rescheduled four appointments.

[¶ 22] Janet offered a myriad of excuses for the lack of visitation and counseling, including car trouble, weather, and lack of employment. The record, however, reveals Janet was leading a nomadic lifestyle and, at the time of the termination hearing, was living in approximately her fifth home since January of 1997.

[¶ 23] There is also evidence at the time of the termination hearing that Janet was still in unstable and questionable living arrangements.

[¶ 24] Janet contends she did not receive appropriate assistance from social services to reunite her with her children, but we do not find this contention supported by the evidence in the record. The evidence is social services encouraged and reminded her of her counseling requirements. Social services attempted to set up a parent aide, but was not able to accomplish a home meeting due to Janet's frequent moves and the weather. Social services conducted four Permanency Planning Meetings to discuss the status and plan for this case and gave notice to Janet. Janet did not attend any of these meetings. Furthermore, when social services made arrangements for housing close to the foster care home in an effort to remedy transportation and weather concerns, Janet refused to live in Wahpeton because she felt more comfortable living with her fiance in Milnor, North Dakota, than living alone and because she felt pressured to do something she did not want to do.

[¶ 25] At the request of the juvenile court, an expert, Dr. Ascano, evaluated Janet. Dr. Ascano's psychological evaluation, report, and testimony indicate he is of the opinion the causes and conditions of the deprivation of the two children are likely to continue and will not be remedied. Dr. Ascano's opinion is based on Janet's intellectual functioning which falls in the moderate mental retardation range making the likelihood of her rehabilitation "guarded to bleak." Dr. Ascano is also of the opinion Janet suffers from a post traumatic stress disorder which would have a profound negative impact on her ability to parent. Dr. Ascano testified that any assistance provided to Janet to improve her parenting capacity would result in limited improvement and would need to be long term

or "forever" because of her limited intellectual functioning.

[¶ 26] Our review of the testimony and record supports the juvenile court's determination the deprivation is likely to continue. We thus conclude there is clear and convincing evidence the causes and conditions of Laura and Jennifer's deprivation are likely to continue and will not be remedied.

### C. Harm to the Children

[¶ 27] A showing of parental misconduct without a showing there is resultant harm to the children is not sufficient in termination cases. *D.S.*, 325 N.W.2d at 659. The probability of serious mental and emotional harm to the children may also be established by prognostic evidence. *Matter of Adoption of P.R.D.*, 495 N.W.2d 299, 303 (N.D.1993). "While the best interests of the child is not the primary consideration in a termination proceeding, it is an important factor which must be considered." *McBeth*, 447 N.W.2d at 323. We have said before, in some cases, "[t]he needs of [the] child must be recognized without further delay if [the child] is to have a reasonable opportunity to enjoy a normal life where love and care are provided on a consistent basis." *Id.*

[¶ 28] Janet argues she was not given a sufficient amount of time to establish counseling and visitation patterns. We have previously found it inappropriate to adopt an arbitrary rule setting forth the time and effort that must be expended to help parents provide an adequate environment for their children before a termination of parental rights is sought. *A.M.A.*, 439 N.W.2d at 539. " 'Even though long-term and intensive treatment may assist the parents, it is not mandated if it cannot be successfully undertaken in a time frame that would enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during long term foster care.' " *Id.; see also In Interest of D.R.*, 525 N.W.2d 672, 675 (N.D.1994).

[¶ 29] This is simply not a case suitable for consideration of long-term foster care. While individual psychological evaluations of the children would have been helpful, there is still clear and convincing evidence in the record the children have been delayed and harmed in their development.

[¶ 30] At the termination hearing, the foster mother testified the children did not know what shampoo was and they were delighted to take a bath which inferred it was not a regular event for them. The foster mother further testified one of the children took food out of the garbage and when questioned said she was hungry at times when she lived with her mother. The foster mother also found food stashed in the child's room. The testimony indicates the children were nonresponsive at first, but as time went on became more verbally and emotionally open and self-assured both in the foster home and at school.

[¶ 31] Dr. Ascano reported, based on the results of the psychological testing of Janet, he is of the opinion that "the children are in a profound risk of psychological neglect due to [Janet's] subaverage parenting skill and lack of stress coping capabilities...." He testified Janet would be unable as the children became adolescents to provide the necessary structure and limit setting. In Dr. Ascano's opinion, the children would end up parenting the mother as she would be unable to meet their psychological and emotional needs.

[¶ 32] Dr. Ascano also described his observations of the interaction between Janet and her children and concluded the children are manifesting ambivalent attachment disorder which would develop into a severe personality disorder if they do not receive the proper emotional nurturing.

[¶ 33] As mentioned previously, Janet's parenting and coping skills will likely not improve in the near future, if ever. These children simply do not have the time to wait for their mother to possibly develop the appropriate skills to meet at least minimal levels of parenting. We conclude thus there is clear and convincing evidence Laura and Jennifer are suffering and will probably suffer serious mental or emotional harm.

### III

[¶ 34] Under our standard of review similar to trial de novo and giving substantial weight to the juvenile court's findings and

opportunity to observe the demeanor and credibility of the witnesses, we conclude there is clear and convincing evidence to support the termination of Janet's parental rights under § 27–20–44(1)(b), N.D.C.C. We affirm.

[¶ 35] VANDE WALLE, C.J., and NEUMANN, SANDSTROM and MESCHKE, JJ., concur.