1998 ND 181

In the Interest of A.S., Child.

Gloria J. MARAGOS, Petitioner
and Appellee,

v.

A.S., child, Respondent.

R.S., mother, Respondent and Appellant,

and

D.S., father, Respondent.

Civil No. 980099.

Supreme Court of North Dakota.

Oct. 14, 1998.

854

Timothy C. Wilhelm, Assistant State's Attorney, Minot, for petitioner and appellee.

Todd L. Cresap of Kenner Sturdevant Peterson Cresap, P.C., Minot, for respondent and appellant.

SANDSTROM, Justice.

[¶ 1] R.S. appeals from the memorandum opinion[1] of the juvenile court, which confirmed the findings of fact, recommendation to terminate parental rights, and right of review issued by a judicial referee on February 5, 1998, in the juvenile court of the Northwest Judicial District. The orders of the referee terminated R.S.'s parental rights to her natural child, A.S. We conclude the juvenile court did not err in confirming the determination of the judicial referee, and there is clear and convincing evidence to warrant termination of parental rights. We therefore affirm.

I

[¶ 2] R.S. and D.S. were married in 1986. They had two children—a boy, born on August 9, 1989, who lives with D.S. and is not a party to this action, and A.S., who was born on December 27, 1994. D.S. does not believe he is A.S.'s father, but R.S. testified he is. D.S. has not contested his rights to remain a parent of A.S.

[¶ 3] After R.S. and D.S. separated, R.S. had physical custody of both children. In June 1995, both children were placed in the temporary care of the Ward County Social Service Board after R.S. left her children with a babysitter for a few hours, and her whereabouts could not be ascertained. This temporary order was terminated the next day when the juvenile supervisor determined a mix-up had occurred. In January 1996, the children were removed from R.S.'s custody after an individual was found dead in R.S.'s trailer, following a party. Several people at the party were doing drugs, and R.S. admitted doing heroin, but claims she was forced.

1. Appeals cannot generally be made from a memorandum decision, but an appeal may be made from a final order affecting a substantial right. N.D.C.C. § 28-27-02. While the juvenile court's decision is referred to as a memorandum opinion, the intent is clearly a final disposition and affirmance of the judicial referee's decision. A review of the findings and recommendations of the judicial referee may be ordered at any time by the juvenile court upon a request for review by one of the parties. N.D. Sup.Ct. Admin. R. 13(11)(a). Thus, the appeal is proper.

A.S. was present during the party. R.S. agreed to a 30–day removal.

[¶ 4] Following this incident, A.S. was placed in foster care, and the boy went to live with D.S. In February of 1996, after R.S. missed two appointments for a chemical dependency evaluation, the juvenile court continued A.S.'s placement in the care, custody, and control of Ward County Social Services for a period of time not to exceed one year.[2] R.S. stipulated to this continuation. R.S. also agreed to complete a chemical dependency evaluation, as well as a psychological evaluation, and follow through with any recommendations resulting from the evaluations. In May 1996, R.S. left North Dakota with a boyfriend to look for roofing work and generally to "get her life in order."

[¶ 5] In the four months before her departure from North Dakota, R.S. had visited with A.S. only seven times. During the same period, she missed at least eight other scheduled visits, each time claiming transportation difficulties.

[¶ 6] Even though R.S. returned to Minot in late December 1996, she did not visit with A.S. again until February 1997. This visit occurred at the time R.S. signed a stipulation seeking to extend Ward County Social Services' care, custody, and control over A.S. for yet another year. R.S. acknowledges she was told at this meeting that if she did not make substantial progress in the next six months, a petition for termination of parental rights would be filed. R.S. visited with A.S. on March 17, 1997, while taking a chemical addiction evaluation. R.S. did not, however, complete the recommended outpatient treatment, and she did nothing to fulfill the court's order regarding the psychological evaluation and follow-through.

[¶ 7] On September 9, 1997, a Ward County juvenile supervisor sent a letter notifying R.S. a petition seeking termination of R.S.'s and D.S.'s parental rights was going to be filed. The letter was sent by certified mail, and the juvenile supervisor testified it was received by R.S. on September 11. R.S. testified she never received the notice, but she was contradicted by her chemical addiction counselor, who testified she saw the letter. R.S. also testified she contacted Northwest Human Services to follow through with the recommendation prior to knowing the petition had been filed.

[¶ 8] On October 3, 1997, the Ward County Social Services director filed a petition for termination of parental rights of R.S. and D.S. with respect to A.S. From the date of filing the petition, and the December 4, 1997, hearing on the petition, R.S. visited A.S. only one time.

[¶ 9] From March 1995 to February 1998, the date of the judicial referee's decision, R.S. had spent a total of only 11 hours with A.S. During the December 1997 hearing on termination of parental rights, several parties, including a social worker, a juvenile supervisor, and the guardian ad litem, testified termination was in A.S.'s best interests.

[¶ 10] The judicial referee concluded, based on clear and convincing evidence, that A.S. was a deprived child, the deprivations were likely to continue, and, as a result of these deprivations, she was suffering harm. The judicial referee recommended termination of the parental rights of R.S. and D.S. The

2. At this point, a hearing should have been held to determine whether termination of parental rights was in order. N.D.C.C. § 27–20–36(7) states:

If an order of disposition is made with respect to a child under the age of ten years pursuant to which the child is removed from the care, custody, and control of the child's parent, guardian, or other custodian without terminating parental rights and the parent and child relationship, the court, before extending the duration of the order, shall determine upon the extension hearing whether the child is adoptable and whether termination of those rights and that relationship is warranted under section 27–20–44 and is in the best interest of the child. In that case the notice of extension hearing must also inform the parties affected that the court will determine whether the child is adoptable and whether termination of their parental rights and the parent and child relationship is warranted and in the best interest of the child and that a further order of disposition may be made by the court placing the child with a view to adoption. If the court determines that the child is adoptable and that termination of parental rights and the parent and child relationship is warranted and is in the best interest of the child, the court shall make a further order of disposition terminating those rights and that relationship and committing the child under section 27–20–47.

decision was confirmed by memorandum opinion of the juvenile court. R.S. appealed.

[¶ 11] The juvenile court had jurisdiction under N.D.C.C. §§ 27–05–06 and 27–20–02(6). R.S.'s appeal is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

## II

[¶ 12] The sole issue on appeal is whether the State of North Dakota has proven termination of R.S.'s parental rights is justified under N.D.C.C. § 27–20–44 as interpreted by the North Dakota Supreme Court.

### A

[¶ 13] "On appeal, we review the juvenile court's decision to terminate parental rights and examine the evidence in a manner similar to a trial de novo." *In Interest of L.F.*, 1998 ND 129, ¶ 12, 580 N.W.2d 573 (citing *In Interest of L.J.*, 436 N.W.2d 558, 560 (N.D. 1989)). We will review the "files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." N.D.C.C. § 27–20–56(1). Although the review is similar to trial de novo, "we give deference to the juvenile court's decision, because that court has had the opportunity to observe the candor and demeanor of the witnesses." *In Interest of N.W.*, 510 N.W.2d 580, 581 (N.D.1994).

### B

[¶ 14] While parents have constitutional protections in the relationship with their biological children, that relationship is not absolute or unconditional. *Matter of Adoption of J.W.M.*, 532 N.W.2d 372, 375 (N.D.1995) (citations omitted). Due process provides certain procedural protections before the relationship may be terminated. *Id.*

[¶ 15] North Dakota's Uniform Juvenile Court Act allows for the termination of parental rights in certain cases. N.D.C.C. ch. 27–20. In North Dakota, a court may terminate parental rights if it finds "[t]he child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer seri-

ous physical, mental, moral, or emotional harm." N.D.C.C. § 27–20–44(1)(b). This section of statute creates a three-part test for termination of parental rights: "1) Is the child deprived? 2) Are the conditions and causes of the deprivation likely to continue? 3) Is the child suffering, or will the child in the future probably suffer[ ] serious physical, mental, moral, or emotional harm?" *L.F.*, 1998 ND 129, ¶ 10, 580 N.W.2d 573 (citing *In Interest of J.L.D.*, 539 N.W.2d 73, 75 (N.D. 1995)). The state must prove all three parts by clear and convincing evidence. *In Interest of D.R.*, 525 N.W.2d 672, 673 (N.D.1994).

#### 1

[¶ 16] A "deprived child" is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27–20–02(5)(a). R.S. did not contest on appeal that A.S. is a deprived child and admits she does not have the present ability to parent, admitting it could take at least 12 months.

[¶ 17] The record clearly supports that A.S. is a deprived child. The judicial referee found the child remains deprived, and there is no evidence to dispute this. Thus, the first prong of the test as derived from N.D.C.C. § 27–20–44(1)(b) has been satisfied by clear and convincing evidence.

#### 2

[¶ 18] R.S. argues the State failed to prove by clear and convincing evidence the deprivation will continue or will not be remedied. There is, however, ample evidence future deprivation will continue unless A.S. is placed in a permanent adoptive home.

[¶ 19] While evidence of past or present deprivation alone is not sufficient to terminate parental rights, evidence of the parent's background, including previous abuse or deprivation, may be considered in determining whether deprivation is likely to continue. *L.F.*, 1998 ND 129, ¶ 16, 580 N.W.2d 573 (citing *J.L.D.*, 539 N.W.2d at 77).

Because evidence of past deprivation alone is not enough, prognostic evidence is evaluated to determine continued or future deprivation. *Id.* This Court has defined prognostic evidence as "evidence that forms the basis for a reasonable prediction as to future behavior." *McBeth v. M.D.K.*, 447 N.W.2d 318, 321 (N.D.1989).

[¶ 20] R.S.'s history with A.S. provides guidance as to possible future deprivations. R.S. herself was apparently in an abusive environment as a child and was adjudged to be a deprived child. She has had no positive role models in her life from whom she could learn to parent. More troubling, however, is R.S.'s lack of contact with A.S. In the two years preceding the juvenile referee's decision, R.S. had spent only 11 hours with A.S. That period encompassed approximately two-thirds of A.S.'s life. R.S.'s past is helpful in determining if deprivation will continue, but since this alone is not enough, we must examine the prognostic evidence.

[¶ 21] In determining whether there was prognostic evidence, the judicial referee heard testimony from a child psychiatrist, Dr. Patrick Mills. The juvenile court found Mills to be very objective, and Mills did not offer an opinion as to whether or not he felt parental rights should be terminated, indicating he could not say prognostically, based on his testing, what R.S. would do in the future. He testified, however, that reintegration should not take place anytime soon.

[¶ 22] Mills performed a series of tests on R.S. in October 1997, including a Child Abuse Inventory, Adult Adolescent Parenting Inventory, Parent–Child Relationship Inventory, and a Parent–Awareness Skill Inventory. Mills testified A.S. should not be returned to R.S. for at least one year and if everything went well, she could be placed back with R.S. in one or two years. Mills was also complimentary of R.S.'s participation in various programs and said she has the potential, with continued work, to provide for a child.

[¶ 23] R.S. argues this opinion by Mills "did not indicate that the prior conduct meant a poor prognosis for parenting ... in the future." R.S. further relies on the testimony of Mills to establish she does have the ability to become a good parent, and down-plays any of the prognostic evidence offered by the State.

[¶ 24] R.S.'s arguments fail to consider, however, the prognostic evidence of others who testified termination was in A.S.'s best interests. The foster care worker involved with A.S. recommended termination of parental rights. The juvenile supervisor also recommended termination, based on the lack of progress made in the case, the case history indicating the deprivation would continue, R.S.'s lack of attempts to visit A.S., her attempts to begin treatment only after notice of termination, and the lack of any relationship between R.S. and A.S. The guardian ad litem also recommended termination because R.S. missed several appointments for chemical dependency evaluations, and because of the lack of contact R.S. has had with A.S. and the necessity of a stable environment for A.S., considering her age.

[¶ 25] A child adolescent psychiatrist testified the period in a child's life up to four years of age is very significant for establishing "object permanency" in relationship to a nurturing figure. Furthermore, the psychiatrist testified R.S.'s history as a deprived child is sometimes an indicator that mothers who had little mothering themselves do not develop as mothers, but rather see the child as a possession.

[¶ 26] R.S. also argues she has made changes, and some testimony supports her position. R.S.'s licensed addiction counselor testified R.S. has done well in treatment, and the addiction supervisor testified R.S. was becoming more in touch with her emotions and had responded well to treatment. However, their testimony does not provide enough prognostic evidence to show R.S. will be a good parent to A.S. or even that she will change her ways. Further, in instances where parents have made drastic changes in their lives in order to maintain parental rights, this Court has still considered the possible harm to the child.

[¶ 27] In *In Interest of J.L.D.*, we found the parent's changes were commendable and his desire to change his life in order to become a good parent was applaudable. But the Court was unwilling to let the child "suffer the predictable consequences when it

turns out that [the father] is unable, unwilling, or unavailable" to be there for the child. 539 N.W.2d 73, 78 (N.D.1995); *see also In Interest of C.K.H.*, 458 N.W.2d 303, 307 (N.D. 1990) (stating "[a]lthough there is some evidence that with long and intensive therapy and assistance, [the parents] might be able to learn and apply proper parenting skills, their children cannot be expected to wait and assume the risks involved"); *D.R.*, 525 N.W.2d at 675 (following *C.K.H.*); *McBeth*, 447 N.W.2d at 322 (finding "when the mental and physical health of a child are the concerns, it is not enough that a mother indicate a desire to improve"); *McBeth v. J.J.H.*, 343 N.W.2d 355, 360 (N.D.1984) (stating "[t]o terminate parental rights, a court need not await the happening of a tragic event").

[¶ 28] Professionals testified time is quickly running out for A.S. Mills testified it is going to take some time for R.S. to acquire the requisite parenting skills necessary to be a mother to A.S. Under the most optimistic scenario, A.S. would be in foster care for one, or possibly two, years. We, like the juvenile court, cannot assume that R.S.'s past transportation problems, which plagued her, will disappear. The juvenile court said it is unlikely that R.S., who now resides in a small community in western North Dakota, will have any more success in arranging meaningful contact with A.S. than she has had in the past.

[¶ 29] As the juvenile court stated:

It can be concluded that [R.S.] has, in the past, and now continues to place [A.S.'s] interests second to other activities including her desire to follow her boyfriend. Although I question [R.S.'s] judgment, I do not conclude that she is a bad person. [R.S.] had entered into two prior abusive relationships. She has few skills which provide economic security. If [R.S.'s] current boyfriend is not abusive and provides a measure of economic security, her priorities are understandable. Unfortunately, [R.S.'s] decisions have caused opportunities to create a bonding relationship with her daughter slip away. [R.S.] says that she should be given a second chance. Unfortunately, [A.S.] will not be given a first chance unless she is immediately placed in a stabile environment and given what pre-

cious little time remains to create a bonding relationship.

[¶ 30] This statement is clearly supported by the record. Thus, the State has shown by clear and convincing evidence the causes and conditions of A.S.'s deprivation are likely to continue, and the second prong of the test as derived from N.D.C.C. § 27–20–44(1)(b) has been satisfied.

3

[¶ 31] In a termination case, the showing of parental misconduct without showing a resultant harm to the child is not sufficient. *D.S.*, 325 N.W.2d at 659. The likelihood of serious mental and emotional harm to the child may also be shown by prognostic evidence. *Matter of Adoption of P.R.D.*, 495 N.W.2d 299, 303 (N.D.1993). As this Court stated in *McBeth*, "the best interests of the child is not the primary consideration in a termination proceeding, [but] it is an important factor [to consider]." 447 N.W.2d at 323.

[¶ 32] R.S. argues that because of the steps she has taken to change her life, the conditions of deprivation have been remedied, or will be remedied, in the future. Further, she argues "the third part of the test presupposes that the conditions and causes of deprivation are continuous and irremediable." R.S. offers no support for this contention, other than her reading of the statute. Nothing in the statute "presupposes" the deprivation need be "continuous or irremediable." A.S. has already had little or no contact with her mother for almost two years. Further, R.S. concedes it will take another 12 months before she is ready to parent A.S. These are currently harmful conditions that could lead to even more future harm. If in 12 months A.S. is taken from foster care, she will have grown even more emotionally attached to her foster parents and will suffer a greater harm at that time. A.S.'s future with R.S. is dependent upon R.S. attaining a suitable degree of parenting skills. Given her background, there is no guarantee.

[¶ 33] Further, R.S. proposes A.S. remain in foster care for the length of time it takes for her to become able to parent. "Un-

der N.D.C.C. 27–20–36(4)(d)(3), a juvenile court should consider permanent foster care, in lieu of termination of a parent's rights, only if it determines that subsequent adoption is not in the best interests of the child." *D.R.*, 525 N.W.2d at 674. We have also said "assisting a parent to establish an adequate environment for the children by offering long[-]term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the child[ ] to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care." *C.K.H.*, 458 N.W.2d at 307. This is exactly the case with A.S., who, in her three short years, has spent very little time with her mother. It would take a long time for them to form the bonds a parent should have with a child. Furthermore, A.S. has developed attachments to her foster parents that are likely to grow even stronger and will cause her unnecessary pain if the foster care relationship is lengthened, then ended.

[¶ 34] What we do here, we do not do lightly. But when we balance the hardship A.S. has already suffered with the lack of a sure future with R.S., this action is clearly appropriate.

### III

[¶ 35] The decision of the juvenile court is affirmed.

[¶ 36] VANDE WALLE, C.J., and NEUMANN and MARING, JJ., concur.

[¶ 37] The Honorable HERBERT L. MESCHKE, a member of the Court when this case was heard, retired effective October 1, 1998, and did not participate in this decision.