619 N.W.2d 494 (2000)
2000 ND 208
In the Interest of W.E. and D.S., Children.
Constance L. Cleveland, Petitioner and Appellee,
v.
Director, Cass County Social Services, S.E., W.E., D.S., and Mervin Nordeng, Guardian ad Litem, Respondents;
S.E., Respondent and Appellant.
In the Interest of D.S., a Child.
Constance L. Cleveland, Petitioner and Appellee,
v.
Director, Cass County Social Services, A.K., S.E., D.S., and Mervin Nordeng, Guardian ad Litem, Respondents;
S.E., Respondent and Appellant.
In the Interest of W.E., a Child.
Constance L. Cleveland, Petitioner and Appellee,
v.
Director, Cass County Social Services, S.E., G.E., W.E., and Mervin Nordeng, Guardian ad Litem, Respondents;
S.E., Respondent and Appellant.
Nos. 20000078-20000080.
Supreme Court of North Dakota.
December 7, 2000.
*495 Constance L. Cleveland, Assistant State's Attorney, Fargo, ND, for petitioner and appellee.
Steven D. Mottinger, Fargo, ND, for appellant.
SANDSTROM, Justice.
[¶ 1] S.E. appeals from an East Central Judicial District Juvenile Court order terminating her parental rights. Concluding the evidence was not sufficiently clear and convincing to satisfy the requirements for termination of S.E.'s parental rights, we reverse.

I
[¶ 2] S.E., a mildly retarded, 22-year-old woman, is the mother of two special-needs children. Her older son was admitted to treatment for aggressive and unruly behavior and was not returned to his mother prior to the termination hearing. Based on the recommendation of social *496 services, her younger son was placed under the legal custody of Cass County Social Services. After he suffered a burn, allegedly inflicted by S.E. as punishment, he was taken from his mother and placed in protective custody. S.E. and social services agreed on a detailed service and treatment plan regarding the younger son's care. Although the younger son was later returned to her care, S.E. did not comply with the terms of the plan, and petitions for termination of parental rights were filed based on the affidavits of social worker Nancy Pillen.
[¶ 3] The older son's father did not respond to the petition, but the younger son's father consented to the termination of his parental rights. The referee held that the older son's father had abandoned him, the children were deprived, S.E. lacked parental abilities, and the children would suffer harm if the parental rights were not terminated. Therefore, the referee recommended termination of S.E.'s parental rights to both children. S.E. requested judicial review, and the district judge affirmed the referee's findings of fact and conclusions of law and adopted the recommendation. See N.D. Sup.Ct.Admin. R. 13.
[¶ 4] S.E. appeals, arguing the court erred in removing the children from the family home and in finding deprivation is likely to continue. At trial, S.E. offered the testimony of members of a church she had joined shortly after termination of parental rights was sought. The church members vowed support to S.E. and her children. S.E. argues the children would not continue to be deprived. The State argues the trial testimony and evidence presented were sufficient to affirm the decision of the judicial referee.
[¶ 5] The juvenile court had jurisdiction to terminate S.E.'s parental rights. N.D.C.C. § 27-20-03(1)(b). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 27-20-56(1).

II
[¶ 6] When reviewing an order terminating parental rights, we review the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. "Although the review is similar to trial de novo, we give deference to the juvenile court's decision, because that court has had the opportunity to observe the candor and demeanor of the witnesses." In the Interest of D.F.G., 1999 ND 216, ¶ 12, 602 N.W.2d 697 (citing In the Interest of A.S., 1998 ND 181, ¶ 13, 584 N.W.2d 853; N.D.C.C. § 27-20-56(1)).

III
[¶ 7] Absent abandonment or consent, termination of parental rights requires satisfaction of a three-part test. N.D.C.C. § 27-20-44(1)(b); D.F.G., 1999 ND 216, ¶ 11, 602 N.W.2d 697. To terminate parental rights, the State must prove by clear and convincing evidence (1) the child is deprived, (2) the conditions and causes of the deprivation are likely to continue, and (3) the child is suffering, or will in the future suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27-20-44; D.F.G., 1999 ND 216, ¶ 11, 602 N.W.2d 697 (citing A.S., 1998 ND 181, ¶ 15, 584 N.W.2d 853).

A
[¶ 8] Are the children deprived? A deprived child is "one who `[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian.'" D.F.G., 1999 ND 216, ¶ 13, 602 N.W.2d 697 (citing A.S., 1998 ND 181, ¶ 16, 584 N.W.2d 853; N.D.C.C. § 27-20-02(5)(a)). S.E. concedes her sons were deprived; therefore, deprivation is not an issue on appeal.

*497 B
[¶ 9] Are the conditions and causes of the deprivation likely to continue? N.D.C.C. § 27-20-44(1)(b). Although she had not complied with a proposed social services support plan, S.E. argues her new church and its members comprise a "fully sustained support system" that will assist her with her parental obligations. S.E. argues the testimony of members of her church establishes that deprivation is not likely to continue. She argues the juvenile court did not offer her the opportunity to take advantage of her new support system to provide further evidence that deprivation is not likely to continue. The petitioner argues the long-term mental health problems of the children and S.E. "create a circumstance where deprivation is likely to continue."
[¶ 10] Evidence of past deprivation, although a factor to consider, is not sufficient to terminate parental rights. D.F.G., 1999 ND 216, ¶ 20, 602 N.W.2d 697 (citing In the Interest of L.F., 1998 ND 129, ¶ 16, 580 N.W.2d 573). Prognostic evidence is required to determine deprivation is likely to continue. Id. (citing In the Interest of J.L.D., 539 N.W.2d 73, 77 (N.D. 1995)). The State argues the testimony of three mental health professionals establishes that the mental health problems are chronic and therefore deprivation will continue.

1
[¶ 11] The first mental health professional to testify at trial was Norman Begnoche, a neuropsychologist. Begnoche testified he diagnosed S.E. as being mildly mentally retarded, but capable of caring for two children with family or social services support. Begnoche completed the first parental capacity evaluation of S.E. Nancy Pillen, a social worker, testified that following Begnoche's evaluation, Jan Witte-Bakken was commissioned by social services to complete a second parental capacity evaluation of S.E. Pillen testified Begnoche's evaluation "didn't necessarily delve into the parenting stuff.... So we requested another parental capacity to be more all-inclusive."
[¶ 12] Witte-Bakken, a licensed psychologist, used Begnoche's evaluation and three meetings with S.E. to complete a second parental capacity evaluation. Witte-Bakken did not address the ultimate issue of termination of parental rights, nor did she evaluate S.E.'s two sons. Witte-Bakken testified S.E.'s home was appropriately furnished, S.E. was able to get the children to school, and S.E.'s home posed no safety hazards for the children.
[¶ 13] Witte-Bakken last evaluated S.E. in April of 1999, and the termination hearing began on December 17, 1999. Witte-Bakken testified she made numerous specific recommendations for social services intervention and those recommendations should have been completed "if the plan was to be returning the children."
[¶ 14] Pillen initiated the petition to terminate S.E.'s parental rights subsequent to this second parental capacity evaluation. Pillen testified she did not follow Witte-Bakken's specific recommendations because social workers had previously attempted or completed services similar to those recommended by Witte-Bakken.
[¶ 15] After seeking a second parental capacity evaluation and concluding the recommendations had already been addressed, Pillen testified her agency resisted a third parental capacity evaluation. Pillen testified the children needed stability and the social work agency had nothing further to offer.
[¶ 16] Finally, licensed psychologist Kevin Schumacher testified. Schumacher evaluated both boys, but did not evaluate S.E. Schumacher stated he had no basis for an opinion about whether S.E. could care for her sons, but he suggested, with a support network and cooperation, she could.
*498 [¶ 17] We conclude that the testimony of Begnoche, Witte-Bakken, and Schumacher does not establish, by clear and convincing evidence, that deprivation was likely to continue.

2
[¶ 18] The remaining testimony does not support a finding that deprivation was likely to continue. In addition to the three mental health professionals, eleven witnesses testified at trial.
[¶ 19] Teneshia Poue, an employee of Community Living Services, testified she worked with S.E. for several months. Poue testified S.E.'s house was tidy and well-kept and S.E. was cooperative and open to receiving services. Poue observed S.E. interact with her younger son and was not concerned that he was in danger or that S.E. was incapable of caring for him.
[¶ 20] Steve Jortstad, a social worker case manager for Community Living Services, testified he supervised Poue and at times S.E. was not fully cooperative. Jortstad also testified, however, that S.E. "has done everything we have asked" in regard to improving the management of her personal finances. He testified S.E. had improved her skills in the three months preceding the termination hearing.
[¶ 21] Amy Simmel, a child care provider at the YMCA, testified she was the primary caregiver and teacher for S.E.'s younger son. Simmel's only concern was that S.E. occasionally used harsh words when addressing her son. Simmel testified S.E. and her son got along well, and testified the boy presented no hygiene problems. Simmel became concerned only after she discovered a burn on the boy's shoulder.
[¶ 22] Patricia Carlson, a head start teacher in Fargo, testified S.E. and her younger son got along well together. Although S.E.'s son was referred for speech assistance, Carlson attributed his speech difficulties to cultural differences. Carlson observed S.E.'s younger son for an entire school year, and although she initially had concerns with the boy's performance and behavior, she testified he improved significantly in a short period of time.
[¶ 23] Jennie Leonne, a parent aide with Cass County Social Services, testified she assisted S.E. with budgeting, preparing food, and caring for the children. Leonne testified she observed interaction between S.E. and both children. She testified S.E. is much more capable of caring for her younger son than for her older son because of the older son's behavior.
[¶ 24] Nancy Schaffer, a licensed social worker who works with child protection, testified she assisted S.E.'s younger son after he was burned. Schaffer testified the boy said he had been pushed back into hot oven racks or stove burners by S.E. Schaffer stated the boy told her S.E. did so, with a knife at his throat, as punishment. Schaffer's testimony conflicts with the testimony of other witnesses regarding the boy's burn. There is no finding below as to how the burn actually occurred.
[¶ 25] The final witness for the State was Pillen, who testified S.E.'s home was always neat and clean and her children were on time. Pillen testified S.E. could be taught home care tasks, but she was incapable of learning abstract parenting skills. Pillen also testified S.E. had made improvements and things went well in S.E.'s home when S.E.'s pastor was present. Pillen testified S.E. was incapable of parenting both children, and the older son was more difficult to parent than the younger son. Pillen testified S.E. could never parent the older boy, but could parent the younger. Pillen testified her goal for the younger son was to get a permanent solution, but she testified "I don't think all connection needs to be shut off between" S.E. and her younger son.
[¶ 26] In rebuttal to the petitioner's evidence, S.E., Claudia Taylor, a licensed foster care provider and member of S.E.'s church, and S.E.'s pastor, Dean Stanley, testified. S.E. testified she did not burn *499 her younger son and she did not like social worker Pillen because Pillen made her feel worthless. S.E. testified she had a ninth-grade education. S.E. testified she was unable to prove her support system to Pillen because Pillen would not let the church members be present while she observed S.E.
[¶ 27] Claudia Taylor testified she is a licensed foster care provider and has cared for over sixty foster children. Taylor is a member of a bi-racial family and has a son with attention deficit disorder. Taylor has a college degree and is working on her master's thesis. Taylor testified she became acquainted with S.E. at church and had observed S.E.'s personality change for the better over a period of months. Taylor testified S.E. babysat for her and was involved in other events with Taylor. Taylor testified S.E. has trouble with social workers due to her lack of trust in them and her feeling of being talked down to, but Taylor did not have any similar troubles with S.E. in the six months they had been acquainted.
[¶ 28] Taylor testified she is willing to open her home to S.E. and S.E.'s children as an alternative to terminating S.E.'s parental rights. Taylor testified she possesses special skills as a foster parent, as a member of a bi-racial family, and as the mother of a child with attention deficit disorder. Taylor testified she was willing to make a long-term commitment to S.E. and to S.E.'s sons and she would seek the assistance of social services if the alternative arrangements did not work.
[¶ 29] Finally, Dean Stanley, S.E.'s pastor, testified on S.E.'s behalf. Stanley stated he, too, would support S.E. and her children in an effort to avoid termination of parental rights. Stanley testified Taylor, along with other members of his congregation, including a social services professor, and another social worker, had all pledged support. Stanley testified he observed S.E. interact with the boys, and the assistance offered would probably be needed for up to twelve years.

3
[¶ 30] We have recognized the difficulty in terminating parental rights, "especially when there has been no claim of intentional deprivation." In the Interest of L.F., 1998 ND 129, ¶ 9, 580 N.W.2d 573 (citation omitted). Further, natural parents have a fundamental right to their children, "which is of a constitutional dimension." Id. (citation omitted). The constitutional protections, although not absolute, require that "[a]ny doubts should be resolved in favor of the natural parent[,] and parental rights should be terminated only when necessary for the child's welfare or in the interest of public safety." Id. (citation omitted). When an alternative exists in the best interests of the children, this Court prefers the alternative over termination of parental rights. In the Interest of M.N., 294 N.W.2d 635, 638 (N.D.1980).
[¶ 31] The juvenile referee's findings and conclusions state "all reasonable efforts have been made to prevent the need for removing these children from their own home ad [sic] to make it possible to return these children to their own home." The findings do not address the assistance and support network offered by S.E. at trial. Further, the referee's findings do not address the fact that social services made no effort to implement the recommendations rendered by Witte-Bakken in the second parental capacity evaluation. Combined, the record and testimony do not establish by clear and convincing evidence that deprivation will continue.

C
[¶ 32] Is the child suffering or will the child in the future suffer serious physical, mental, moral, or emotional harm? The petitioner argues S.E.'s inability to manage her finances, her employment history, and her resistance to social services suggest there will likely be harm to the children.
*500 [¶ 33] S.E. argues social services "presented a threatening, intimidating presence in her life" and social workers failed to comply with recommendations of mental health professionals. Further, S.E. argues the testimony of the children's guardian ad litem establishes that termination of parental rights was premature and the burn the younger boy suffered was the sole reason that the children were no longer in S.E.'s custody.
[¶ 34] The likelihood of serious harm may be shown by prognostic evidence. D.F.G., 1999 ND 216, ¶ 28, 602 N.W.2d 697. The petitioner argues instability and inconsistency in S.E.'s parenting skills and her resistance to services demonstrate likely future harm to the children. This Court does not set forth an arbitrary time for parents to demonstrate an ability to properly parent their children before termination is sought. L.F., 1998 ND 129, ¶ 28, 580 N.W.2d 573. S.E. argues her level of functioning would allow her to "learn appropriate limit setting, discipline and safety measures," particularly in light of the support offered by her pastor and church members, including a social worker. S.E. argues supplemental services and a reasonable time would allow her to develop and demonstrate her ability to properly parent her sons.
[¶ 35] At trial, the children's guardian ad litem and S.E. argued termination of parental rights was premature. The juvenile court heard the testimony of numerous witnesses, including three mental health professionals. Each of the mental health experts testified S.E. has the ability to parent her children but she requires help to do so. The testimony establishes that both sons have special needs and S.E. lacks the ability to care for the children herself. However, the testimony does not establish that physical, emotional, or mental harm to the children is likely as long as S.E. has the required assistance.

IV
[¶ 36] "It is not reason enough to deprive parents of custody that their home is not the best, or even that they are not the best parents that could be offered to the child, so long as the child does not suffer physical or moral harm, or lack of food or clothing." In the Interest of M.M.C., 277 N.W.2d 281, 286 (N.D.1979) (citations omitted).
[¶ 37] The trial testimony and record demonstrate that with assistance from her family, church, and trained social services professionals, S.E. may properly care for her children. We agree with the children's guardian ad litem that termination of S.E.'s parental rights was premature. We note S.E.'s ability to properly care for her sons is "heavily dependent upon the assistance" of others. Id.
[¶ 38] Although testimony shows that the difficulty of parenting these children will increase, after an extensive examination of the record, we conclude the record and testimony presented to the juvenile court referee do not support termination of S.E.'s parental rights.
[¶ 39] We do not lightly consider the younger son's burns, allegedly inflicted by S.E. For this reason, and because deprivation is conceded, we remain assured that the juvenile court will maintain jurisdiction over the children and will ensure that the appropriate supervision and monitoring of these children will continue. A petition for termination of parental rights may again be filed at a later date if the parenting of these children becomes so difficult that continuing deprivation and harm result or if the support network posed by S.E. is no longer viable.

V
[¶ 40] We conclude the juvenile court erred in finding that parts two and three of the parental termination test were proven by clear and convincing evidence. We therefore reverse the order terminating *501-509 S.E.'s parental rights and remand to the juvenile court.
[¶ 41] VANDE WALLE, C.J., NEUMANN, MARING, KAPSNER, JJ., concur.
Editor's Note: The opinion of the Supreme Court of North Dakota, in Logan v. Bush, published in the advance sheet at this citation, 619 N.W.2d 501, was withdrawn from the bound volume because it will be republished with the opinion on the petition for Rehearing.