623 N.W.2d 418 (2001)
2001 ND 59
Interest of A.L. and J.L., children.
Constance L. Cleveland, Petitioner and Appellee,
v.
Director, Cass County Social Services, R.L., C.P., A.L., J.L., and Benjamin Thomas, Guardian ad Litem, Respondents,
C.P. and R.L., Respondents and Appellants.
Nos. 20000217-20000220.
Supreme Court of North Dakota.
March 20, 2001.
*419 Constance Louise Cleveland, Assistant State's Attorney, Fargo, ND, for petitioner and appellee.
Jared S. Simonson, Fargo, ND, for respondent and appellant C.P.
Steven D. Mottinger, Fargo, ND, for respondent and appellant R.L.
SANDSTROM, Justice.
[¶ 1] C.P. and R.L. separately appeal from a juvenile court order adopting a judicial referee's recommendation to terminate their parental rights to A.L. and J.L. We conclude there is clear and convincing evidence to warrant termination of their parental rights. We affirm.

I
[¶ 2] C.P. is the mother and R.L. is the father of A.L., born on February 16, 1990, and J.L., born on July 9, 1991. The parents have a history of domestic violence, chemical abuse, and lack of appropriate supervision of the children. Between 1990 and 1999, their children were the subject of twenty child protection assessments for abuse and neglect. The parents have been offered social services, and several service contracts were developed to address their problems, with little change in their behavior. The children have been in foster care several different times. In February 1999, the children were placed in foster care as a result of C.P.'s report that the home was unstable because of the parents' domestic violence and chemical abuse. The placement eventually culminated in this petition to terminate the parental rights of R.L. and C.P. to their children.
[¶ 3] A judicial referee recommended finding the children were deprived because they were "without proper parental care, control, subsistence, or education as required by law or other care or control necessary for [their] physical or mental or emotional health or morals and the deprivation [was] not due primarily to the lack of financial means of the parents"; "the circumstances which cause the deprivation are likely to continue or will not be remedied"; and "[t]he children will probably suffer serious physical, mental, moral, or emotional harm [i]f parental rights are not terminated." The juvenile court adopted the referee's recommendation.
[¶ 4] The juvenile court had jurisdiction under N.D.C.C. §§ 27-20-02(11) and 27-20-03(1)(b). The appeals are timely under N.D.C.C. § 27-20-56(1), N.D.R.App.P. 4(a), and B.R.T. v. Executive Dir. of Soc. Serv. Bd., 391 N.W.2d 594, 597 *420 (N.D.1986). This Court has jurisdiction under N.D. Const. art. VI, §§ 2, 6, and N.D.C.C. § 27-20-56(1).

II
[¶ 5] A juvenile court may terminate parental rights if the court finds the child is deprived; the conditions and causes of the deprivation are likely to continue or will not be remedied; and the child is suffering, or in the future will probably suffer, serious physical, mental, moral, or emotional harm. N.D.C.C. § 27-20-44(1)(b). See In Interest of A.S., 1998 ND 181, ¶ 15, 584 N.W.2d 853; In Interest of L.F., 1998 ND 129, ¶ 10, 580 N.W.2d 573. The State must prove the elements for termination by clear and convincing evidence. A.S., at ¶ 15; L.F., at ¶ 10.
[¶ 6] We review a juvenile court's decision to terminate parental rights in a manner similar to a trial de novo. A.S., 1998 ND 181, ¶ 13, 584 N.W.2d 853; L.F., 1998 ND 129, ¶ 12, 580 N.W.2d 573. We review the "files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." N.D.C.C. § 27-20-56(1). Although our review is similar to trial de novo, we give deference to the juvenile court's decision because the court had the opportunity to observe the candor and demeanor of the witnesses. A.S., at ¶ 13; L.F., at ¶ 12.

III
[¶ 7] C.P. argues the juvenile court should have continued the proceeding to determine whether the children were of "Indian child" status under the Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq. ("I.C.W.A."). According to C.P., if the court knows an Indian child is involved in an involuntary termination proceeding, the child's tribe must be notified so it can intervene, and if the tribe is not known, the Secretary of Interior must be notified.
[¶ 8] In 1978, Congress passed the I.C.W.A., which contains an express congressional declaration of policy:
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.
25 U.S.C. § 1902.
[¶ 9] Under 25 U.S.C. § 1912, in any involuntary proceeding in a state court "where the court knows or has reason to know that an Indian child is involved," the party seeking termination of parental rights to an Indian child shall by registered mail notify the Indian child's tribe of the pending proceeding and its right to intervene, and if the identity or location of the tribe cannot be determined, the notice shall be given to the Secretary of Interior.[1] Before the notice provisions of the I.C.W.A. apply, the court must know or have reason to know an "Indian child" is involved. An "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).
[¶ 10] The party asserting the applicability of the I.C.W.A. must produce evidence for the court to decide whether a child is an "Indian child." In Interest of A.G.-G., 899 P.2d 319, 322 (Col.Ct.App. 1995); In re Interest of J.L.M., 234 Neb. 381, 451 N.W.2d 377, 387 (1990). Other *421 courts have held unsupported claims of "Indian child" status are insufficient to trigger the notice provisions of the I.C.W.A. See Matter of Appeal in Maricopa Cty., 136 Ariz. 528, 667 P.2d 228, 233 (Ct.App.1983); A.G.-G., at 322. In A.G. G., at 322, the court said "Indian child" status can be established by affidavits of tribal officials, or testimony of the children's biological parents. See also Application of Angus, 60 Or.App. 546, 655 P.2d 208, 212-13 (1982).
[¶ 11] Here, at the termination hearing, the following colloquy occurred:
MR. SIMONSON [counsel for C.P.]: Just a moment, I believe there is another matter of business I believe is a threshold issue. Its [sic] in regards to the Indian Child Welfare Act. It has come to my attention most recently in the last day or so that [C.P.] is a one quarter Indian and a member of the Turtle Mountain Indian Tribe. The children then presumably are one eighth Indian for her. Concerning [R.L.'s] ancestry or lineage is unknown. We would ask that the Court um, we would ask to invoke the Indian Child Welfare Act for this proceeding based on [C.P.'s] Indian lineage, and the children's potential enroll ability [sic] in the tribe.
THE COURT: Which tribe?
MR. SIMONSON: Well that is not clear to me, Your Honor. The information I have is that [C.P.'s] father is one-half Native American. He owns Indian, he is now deceased. He owned Indian land in North Dakota, South Dakota, and Montana. We do know that he was a member and that [C.P.] is enrolled in the Turtle Mountain Indian Reservation. We know what the criteria is in regards to enroll ability [sic]. We do not know if he was a member of the Wahpeton-Sisseton Tribe. If he was the children would be enroll able [sic], eligible in that tribe. [C.P.] may be enrolled in that tribe. That is unknown. Its [sic] my further understanding that [C.P.'s] parents enrolled her in the tribes. I am not sure which tries [sic] she is enrolled in. We now [sic] she is enrolled in the Turtle Mountain. In my view the only way to make a full determination over the Indian children's enroll ability [sic] would be for an inquiry to be made to the Bureau of Indian Affairs and find out any and all tribes in which [C.P.] is possibly enrolled in. There may be the Wahpeton-Sisseton.
THE COURT: She is enrolled in the Turtle Mountain?
MR. SIMONSON: Yes she is.
THE COURT: And you have no information as to any other enrollment?
MR. SIMONSON: No I do not.
THE COURT: These children are um or are not enroll able [sic] in the Turtle Mountain?
MR. SIMONSON: That is unknown to me.
THE COURT: Miss Cleveland?
MS. CLEVELAND [counsel for the State]: Yes, Your Honor. I believe I have provided a copy of a facsimile received from Turtle Mountain Band of Chippewa by miss [sic] Johnson the 28th of March, which was a response to our inquiry after um, this issue has been raised at the eleventh hour. It was clearly stated the children were not eligible for enrollment, and that Ms. P., was enrolled. Further they did not anticipate or they will not be intervening on behalf of the children in this matter. Your Honor, I have marked copies of that, which I have disclosed to al [sic] parties. This is simply a facsimile. It bears further testimony on this issue. Miss Johnson is present. I would offer Petitioner's Exhibit 18, which is two pages, and bears a facsimile cover sheet dated 3-29, 2000, from the Turtle Mountain Band of Chippewa to Lisa Johnson. The second is a letter signed by Marilyn Poitra, the ICWA coordinator of the Turtle Mountain Band of Chippewa Indians, setting forth their position on this case.

*422 THE COURT: All right.
MR. SIMONSON: I would object on heresay [sic], Your Honor. A determination concerning the enroll ability [sic] of a child is done by the tribe, in this case apparently the state has contacted Marilyn Poitra, who is the Indian Child Welfare Act coordinator. After the state has provided me a copy of this document I called the tribe, at one of the two numbers that are on the letterhead, and I talked to an Ernest Pattenaudy, who is the director of the child welfare, whom Marilyn Poitra works for. Its [sic] my understanding from my conversation with him is that Marilyn can not unilaterally make a decision concerning enroll ability [sic] of a child. Its [sic] done by conference, its [sic] um, there is a committee. He also indicated that the Turtle Mountain Indian Reservation is the only Tribe whose enrollment is governed by the Bureau of Indian Affairs. In this case we have a letter that is being presented to the Court which sets that um, one of the membership requirements is one fourth or more Indian blood. She goes on to say if the father does not have Indian blood A., and J., would be determined to possess one eighth. This to me represents an opinion by Marilyn, does not represent to me an official determination for the purpose of relying on the, the court relying on whether or not the ICWA is invoked.
....
THE COURT: Mr. Thomas?
MR. THOMAS [guardian ad litem]: Your Honor, I think the only information we have is that the children may be one eighth American Indian. The information from the Tribe suggests that would be um, not sufficient to make them enroll able [sic] with Tribe. There is no other information before the Court to suggest that they are enroll able [sic] in any other specific Tribe, nor that they may have more than one eighth Native American blood, and absent some clear indication that the children are either enrolled or enroll able [sic] I don't think that the Indian Child Welfare Act applies to these proceedings.
THE COURT: All right. Well the proffered exhibit is clearly heresay [sic]. Also consistent with the Court's prior experience with the Turtle Mountain band requires one fourth Indian blood to be registered. In that regard it basically sets out the law Mr. Simonson. I will receive the exhibit just as confirmation of my taking judicial notice of the legal status as to ICWA enroll ability [sic] in the Turtle Mountain Tribe. In any event I have no information today that leads me to believe they are Indian children with regard to ICWA.
[¶ 12] C.P. offered no evidence to suggest the children were subject to the I.C.W.A. She made no offer of proof at the termination hearing, and she relies solely on her counsel's statements about the children's potential eligibility for enrollment in the Turtle Mountain Indian Tribe and other "unknown" tribes. The juvenile court decided it had no information which led it to believe the children were of "Indian child" status under the I.C.W.A. Nothing in this record suggests the children were members of an Indian tribe, or eligible for membership in an Indian tribe, and counsel's unsupported and vague statements were insufficient to suggest "Indian child" status. We conclude the juvenile court did not err in deciding there was no evidence to invoke the I.C.W.A.

IV
[¶ 13] R.L. and C.P. argue the juvenile court's decision to terminate their parental rights is not supported by the evidence. They argue the State did not show by clear and convincing evidence the conditions of deprivation were likely to continue or would not be remedied. C.P. argues the State offered no evidence to clearly and convincingly establish her actions posed a harm to the children.
*423 [¶ 14] Although evidence of past deprivation alone is not sufficient to terminate parental rights, evidence of the parents' background, including previous abuse or deprivation, may be considered in determining whether deprivation is likely to continue. A.S., 1998 ND 181, ¶ 19, 584 N.W.2d 853. Because evidence of past deprivation alone is not enough to terminate parental rights, prognostic evidence is necessary to determine continued or future deprivation. Id. We have defined prognostic evidence as evidence that forms a basis for a reasonable prediction of future behavior. Id.
[¶ 15] The juvenile court's written findings specifically state the children were deprived because they were "without proper parental care, control, subsistence, or education as required by law or other care or control necessary for [their] physical or mental or emotional health or morals and the deprivation [was] not due primarily to the [parents'] lack of financial means"; "the circumstances which cause the deprivation are likely to continue or will not be remedied"; and the "children will probably suffer serious physical, mental, moral, or emotional harm [i]f parental rights are not terminated." The court's oral findings state:
Taking into account the rather extensive files and records in this matter, the exhibits offered, the testimony offered, and the arguments heard this morning, what strikes me of course is the fact that we are looking at essentially a full decade of unchanging behavior. The outstanding elements of that decade are essentially as follows:
That these two parents have an extraordinarily dysfunctional relationship. They have shown no inclination whatsoever to modify that for the better in any fashion. That relationship is ongoing and at this point I don't think I could be convinced by either that they have any intention of going their separate ways.
These parents over that decade have demonstrated a serious situation of chemical and/or alcohol abuse. I have reason to believe that such is ongoing and I have reason to believe that neither parent is interested in addressing these difficulties even at this late date. That over this decade the parties have engaged in a continuous process of domestic violence. It appears that that is ongoing and I have no reason to believe that in the future that is likely to abate.
The 10 years of you [sic] unchanging behavior despite the offer of all possible services offered to these parents to help them change is prognostic evidence enough. Quite frankly as supplemented to some degree by the expert opinions that have been tendered.
I, A, find these children to be deprived. I, B, find that the circumstances of deprivation are most unlikely to abate or moderate in the foreseeable future.
These children I believe have been harmed to a very significant extent by the environment presented them over their short lives by their parents. To continue the children in limbo or in the alternative to return these children to their parents would in my opinion only exacerbate or extend or increase the harm to these children. They are entitled to some final result as to this relationship.
[¶ 16] The evidence supports the court's finding these parents had been offered services for almost ten years and they refused to change their behavior to prevent deprivation of the children. This Court has recognized a juvenile court need not operate in a vacuum in termination proceedings. In the Interest of R.M.B., 402 N.W.2d 912, 917 (N.D.1987). Here, the evidence indicates a pattern of conduct by the parents that forms a basis for a reasonable prediction of their future behavior, see A.S., 1998 ND 181, ¶ 19, 584 N.W.2d 853, and establishes the children are suffering, or will suffer serious physical, mental, moral, or emotional harm because of the parents' future behavior. Under *424 our de novo standard of review and giving appreciable weight and deference to the juvenile court's findings, we conclude the court's decision is supported by clear and convincing evidence.

V
[¶ 17] C.P. argues the evidence does not support the juvenile court's finding the children were adoptable and the termination of her parental rights was in the children's best interest. To the extent the best interests of the children is an important factor in termination proceedings, see A.S., 1998 ND 181, ¶ 31, 584 N.W.2d 853, the evidence supports the court's finding. Issues about adoptability of the children, however, are not part of the necessary proof for the termination of parental rights. See N.D.C.C. § 27-20-44(1)(b).

VI
[¶ 18] We affirm the juvenile court order.
[¶ 19] VANDE WALLE, C.J., NEUMANN, MARING and KAPSNER, JJ., concur.
NOTES
[1] 25 C.F.R. § 23.11(c)(3) says for proceedings in North Dakota, notice also shall be sent to the Bureau of Indian Affairs Area Director in Aberdeen, South Dakota.